[Civ. No. 22540. Second Dist., Div. Two. May 13, 1958.]

NORMAN NATHAN GRAND et al., Petitioners and Appellants; NELLIE GRAND, Respondent, v. F. W. GRIESINGER, as Real Estate Commissioner, etc., et al., Defendants and Appellants.

Francis C. Jones for Petitioners and Appellants.

Edmund G. Brown, Attorney General, and Lee B. Stanton, Deputy Attorney General, for Defendants and Appellants.

No appearance for Respondent.

ASHBURN, J. — The Real Estate Commissioner, after charges made and hearing duly had, ordered revocation of the respective licenses of Norman Nathan Grand, William Samuel Grand and Nelly Grand[1] as real estate salesman. Upon review through administrative mandamus the superior court upheld the ruling as to Norman and William and denied mandate; they appeal from the ruling. As to Nelly Grand the court held that the findings were not supported by the weight of the evidence and accordingly adjudged that the order revoking her license as real estate salesman be vacated, and that a peremptory writ be issued to that end. From this ruling the commissioner takes a cross-appeal.

---

[1] The first name of this defendant is spelled Nelly and Nellie throughout the proceedings herein.

APPEAL OF NORMAN AND WILLIAM GRAND

There is little dispute about the facts for most of them are covered by a written stipulation filed at the hearing before the commissioner. Each of the Grands had a real estate salesman's license. Norman's dated from July 1, 1952, William's from June 2, 1953, and Nelly's from March 18, 1954. None of them ever had a broker's license. Their activities concerned real estate rental agencies, which have been held to fall within the terms of section 10131, Business and Professions Code. So far as pertinent it provides: "A real estate broker . . . is a person who, for a compensation, . . . rents or places for rent, or collects rent from real estate, or improvements thereon, for another or others." It has been held that the activities of such an agency require a broker's license as a condition to lawful operation (*Dyer* v. *Watson*, 121 Cal.App.2d 84, 89 [262 P.2d 873] ; 18 Ops. Cal. Atty. Gen. 191). The commissioner's findings described such activities as follows: "[T]hat the business of said rental agency consisted, generally, of procuring information from landlords about places that were available for rent and of selling service to registered clients for a fee, the service consisting of making available to the clients information concerning rental vacancies, as the information then appeared in the records of the rental agency." A salesman cannot operate such a rental service on his own account; he must be employed by and act for a broker.

Norman Grand was licensed as a salesman under William C. Banta from August 19, 1952 to March 31, 1953. He then transferred his license to Ellen L. Noy, another broker, and remained so licensed until January 28, 1954; about May 19, 1954, he became licensed as a salesman under Oscar D. Ballew, another broker.

Prior to employment by any broker Norman operated such a rental service under the name "Guaranteed Rental Service" for about three weeks in August, 1952. Having discovered that operation to be illegal he made a joint venture agreement with broker Banta whereby he acquired a two-thirds interest in Banta's business, known as "The Guaranteed Rental Service." The agreement required Grand to assume complete responsibility for the business, operational costs being shared pro rata. All proceeds of the business were to be deposited in a bank, subject to withdrawal on the signatures of both parties. Banta's name was on the window. This operation—from August, 1952 to April 1, 1953—led to bankruptcy of Norman.

On April 1, 1953, he made an agreement with broker Ellen L. Noy, to operate a rental service under the name of Security Realty Service, paying her 25 per cent of the net income and agreeing to protect her "from any and all added responsibilities and incurred costs of this department." Norman operated rental services for Mrs. Noy in four different localities. She testified, in part: "Q. Then the operation of the office was to be under your direction then, is that correct? A. At my office, but the rental department entirely under his—— Q. Didn't you intend to supervise its direction? A. It was not my job—he was there all the time. Q. And was entirely under his contract? A. He was in complete charge of it. Q. That's right, but you nevertheless were the directing broker that controlled the office. A. That was one of the services that I put out in my office, but he was the manager of it and separate contractor on it." This continued from April 1, 1953 to January 16, 1954, and Mrs. Noy testified that "he was on a vacation most of the time." Late in April he went with Nelly (whose name then was Ferrera) on a visit to Mexico, which seems to have been a honeymoon trip for them. He left his father William, his mother Verna, and his brother Howard in charge of the rental service. William had no salesman's license to operate under Mrs. Noy until June of 1953, and the other two were not licensed at all.

In November, 1953, a new contract was made with Mrs. Noy. Norman and Nelly are named as "second party" therein. It provides that Mrs. Noy "will continue to permit the second party to operate a rental service under the fictitious name 'Security Realty,' which name is duly licensed to the first party by the State of California Real Estate Commission;" also, "that all bills, debts, wages, rental service complaints, management, and control of above operation to be the sole responsibility of the second party, in so far as Real Estate Law of the State of California permits;" that Mrs. Noy should have 10 per cent of the net profit and the second party 90 per cent thereof. Norman was in complete charge of this rental service so far as Mrs. Noy was concerned, but Nelly was helping him to operate. Norman testified that he divided the profits with William. Because of debts owing her from Norman and Nelly, Mrs. Noy took over the Whittier rental office in January, 1954. The commissioner found in this connection: "That during said periods said respondent Norman Nathan Grand deposited funds received in the operation of the respective rental agencies into bank accounts; that these

said accounts provided for withdrawals by the said respondent only; that he assumed to pay all expenses incurred in connection with these said agencies; that he had full authority and did exercise full authority to employ and discharge personnel needed to assist him in his business, to compensate such personnel and to pay all other expenses incurred in said businesses," and the trial court held the finding to be supported by the weight of the evidence.

The commissioner also found that Norman, during the months of May to August, inclusive, of 1953, employed Verna Grand, his mother, in the business; that she in 158 specific instances "interviewed, determined their needs, filled out registration cards and accepted registration fees from prospective tenants and clients;" that she had no license whatever and the fact was known to Norman. It was also found that Nelly was employed by Norman and did the same type of work during a period when she had no license, as Norman knew.

William Grand, the father, made an agreement with broker Oscar D. Ballew in December, 1953, for operation of a rental business under the name "Select Realty," Grand to be responsible for all expenses and to handle all receipts and to pay Ballew 10 per cent of the profit derived from the rental business. Ballew worked for the telephone company every day except Saturday and Sunday, and was in the office only on those days. William testified: "A. Yes, after I resigned with Mrs. Noy I did have Mr. Ballew for a couple of months—he was in the office and had desk space. I opened up the Select Realty with him as my broker in San Gabriel." The commissioner further found that William employed Howard Grand to interview prospective renters, etc., during the period from July 15 to November 1, 1954; that Howard had no license, as William knew, and that he received compensation from William for said services; also, that William's wife Verna was employed and acted for him in the same capacity, she having no license and William being cognizant of that fact. Commissioner's finding XXIV says: "That the interviewing of prospective renters, determining their needs, completing registration cards, and accepting fees from these prospective renters for the purpose of giving them information concerning places available for rent, was and is a real estate activity requiring a real estate broker or salesman license under the provisions of Sections 10131 and 10132 of the Business and Professions Code of the State of California." By way of "determination of issues" the commissioner further found

that each of the three respondents "was and is in violation of Sections 10130, 10131, 10137, 10177(d) and 10177(f), Business and Professions Code of the State of California."

■ Though counsel for appellants Norman and William Grand repeatedly asserts insufficiency of the evidence, his brief does not comply with the rule or the authorities governing such a claim. Rule 15(a) of the Rules on Appeal requires: "Each point in a brief shall appear separately under an appropriate heading, with subheadings if desired. Such headings need not be technical 'assignments of errors' but should be concise headings which are generally descriptive of the subject matter covered. The statement of any matter in the record shall be supported by appropriate reference to the record. . . ." Appellants have not complied with these requirements. Nor has counsel furnished adequate basis for a review of the evidence. ■ "The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. (*Kruckow* v. *Lesser*, 111 Cal. App.2d 198, 200 [244 P.2d 19].) ■ It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings. The reviewing court is not called upon to make an independent search of the record where this rule is ignored. (*Goldring* v. *Goldring*, 94 Cal.App.2d 643, 645 [211 P.2d 342].)" (*McCosker* v. *McCosker*, 122 Cal.App.2d 498, 500 [265 P.2d 21].) ■ "A claim of insufficiency of the evidence to justify findings, consisting of mere assertion without a fair statement of the evidence, is entitled to no consideration, when it is apparent, as it is here, that a substantial amount of evidence was received on behalf of the respondents. Instead of a fair and sincere effort to show that the trial court was wrong, appellant's brief is a mere challenge to respondents to prove that the court was right. And it is an attempt to place upon the court the burden of discovering without assistance from appellant any weakness in the arguments of the respondents. An appellant is not permitted to evade or shift his responsibility in this manner." (*Estate of Palmer*, 145 Cal.App.2d 428, 431 [302 P.2d 629].) See also 3 Witkin, California Procedure, section 149, page 2330.

Appellants' counsel actually has shown that the claim of

insufficiency of the evidence is not a substantial one, for the opening brief says: ''Through oral and documentary evidence it was established that the Appellants entered into agreements either oral or written with various brokers under whom they were licensed, under the terms of which, they would act as managers of real estate offices operated under a fictitious name or otherwise which were duly registered with the Real Estate Commission, as the office of the particular broker and naming the Appellants as salesmen and naming the broker as the responsible broker. Under these agreements the Appellants were to accept the responsibility of the management of the office, the hiring and firing of employees, the banking of the receipts of the real estate office, the payment of the bills from the proceeds thereof, maintenance of bank accounts in the names of the Appellants and the placing of advertising in the various newspapers, charging the cost thereof on some occasions to the Appellants.''

The gist of appellants' contention is a claim that the judgment is against law in that it is not supported by the findings. The argument runs as follows: ''Appellants contend that with the registration of a licensed salesman with the Real Estate Commission by a duly licensed broker, wherein the broker names himself as the responsible broker under the Real Estate Law, as set forth in the Business and Professions Code, that thereafter the salesmen could not be charged with acting as a broker unless, his acts complained of were without the knowledge or without the consent of the broker. The mere assumption of responsibility which has been accepted by the salesman at the direction of the broker could certainly never be construed to mean that the salesman is attempting to act as a broker for the very obvious reason that a salesman accepting authority delegated to him by the broker as manager of the office would be in constant peril of the loss of his license. Under sections 10131 and 10132 of the Business and Professions Code it will be noted that the duties and capacity of a broker and a salesman are identical excepting a salesman must be employed by a broker, therefore the salesman has the power and authority to do anything that a broker can do except that he must perform the acts as an employee of the broker.'' It rests upon a misconception drawn from the similarity of language used in sections 10131 and 10132, Business and Professions Code.

Section 10131, at the time pertinent to these proceedings, defined the term ''real estate broker'' as follows: ''A real estate broker within the meaning of this part is a person

who, for a compensation, sells or offers for sale, buys, or offers to buy, lists, or solicits for prospective purchasers, or negotiates the purchase or sale or exchange of real estate, or who, for compensation, negotiates loans on real estate, leases, or offers to lease, or negotiates the sale, purchase, or exchange of leases, rents, or places for rent, or collects rent from real estate, or improvements thereon, for another or others." Section 10132 defined real estate salesman: "A real estate salesman within the meaning of this part is a natural person who for a compensation is employed by a licensed real estate broker to sell, or offer for sale, or to list, or to buy, or to offer to buy, or to negotiate the purchase or sale or exchange of real estate, or to solicit for prospective purchasers of real estate, or to negotiate a loan on real estate, or to lease, or to negotiate the sale, purchase or exchange of leases, or offer to lease, rent or place for rent, any real estate, or improvements thereon." The differences in language are small, but the divergence in import is large. A broker performs the specified services "for another or others," meaning the public, while a salesman must be "employed by a licensed real estate broker." Both act for compensation, but the salesman cannot "be employed by or accept compensation from any person other than the broker under whom he is at the time licensed." (§ 10137.)[2]

In order to obtain a salesman's license one must present "the recommendation of the broker who is to be his employer, certifying that the applicant is honest, truthful and of good reputation." (§ 10151.) This is all he needs except to pay a small fee and pass the required examination, which is less exacting than the one given to a prospective broker. When a salesman's application is granted his license goes into possession of his broker-employer and there remains until cancelled or the salesman leaves the employ of the broker. (§ 10160.) When one of these events occurs the license goes not to the salesman, but to the commissioner for cancellation. (§ 10161.) When the salesman makes a contact with a new broker the process is repeated. (§ 10219.) The broker must "exercise reasonable supervision over the activities of his salesmen" or hazard the suspension or revocation of his own license (§ 10177h). A salesman can graduate into the status of broker only after arriving at the age of 21 (10 Cal. Admin. Code, § 2720); a salesman's license can issue at age 18 (10

---

[2]All section references herein relate to the Business and Professions Code.

Cal. Admin. Code, § 2750); a broker must be a citizen of the United States (§ 10150.5), although this is not true of a salesman.

The applicant for broker's license must have had two years' experience as a salesman, or "at least the equivalent of two years' general real estate experience or graduation from a four-year college or university course, which course included specialization in real estate." (§ 10150.6.) He must be recommended by two real estate owners of the county of his residence or business, "certifying that the applicant is honest, truthful and of good reputation and recommending that a real estate broker's license be granted to him." (§ 10150.) He must also be approved by a committee of not less than three members of the State Real Estate Board. (§ 10150.6.)

██ It is evident that brokers and salesmen belong in distinctly different categories and that the broker, because of his superior knowledge, experience and proven stability is authorized to deal with the public, contract with its members and collect money from them; the salesman, on the other hand, is strictly the agent of the broker. He cannot contract in his own name (*Tatterson* v. *Standard Realty Co.*, 81 Cal.App. 23, 29 [253 P. 770]; *Weber* v. *Tonini*, 151 Cal.App.2d 168, 170-171 [311 P.2d 132]; 9 Cal.Jur.2d, § 70, p. 227), nor accept compensation from any person other than the broker under whom he is licensed; it is a misdemeanor for anyone, whether obligor, escrow holder, or otherwise, to pay or deliver to anyone other than the broker compensation for services within the scope of the act. (§ 10138.) ██ The entire statutory scheme requires the broker actively to conduct his brokerage business and to supervise the activities of his salesmen. It precludes a salesman from taking charge of or conducting a business such as a rental agency which requires a broker's license.

The revocation of the licenses of Norman and William Grand was clearly justified by the facts and applicable law.

### CROSS-APPEAL OF REAL ESTATE COMMISSIONER

The commissioner appeals from the portion of the judgment in favor of Nelly Grand. The ruling seems to be based upon a finding "that the Commissioner's Findings, to the extent that they find that NELLY GRAND acted as a real licensee for compensation, are not supported by the weight of the evidence; and to that extent the Real Estate Commissioner has abused his discretion to the prejudice of NELLY GRAND."

The brief of appellants Norman Grand and William Grand says: "As the lower court ruled in favor of Nelly Grand, and directed that the order made revoking the license of the said Nelly Grand be vacated and set aside, the entire statement of facts and argument will concern themselves only with these Appellants no further reference will be made to any evidence concerning the said Nelly Grand." No brief in response to cross-appellants' opening brief was filed on behalf of Nelly Grand. Thereby she admitted the facts to be as stated by cross-appellants, and in effect consented to a reversal. (See rule 17(b) of Rules on Appeal; *Postin* v. *Griggs*, 66 Cal.App.2d 147, 148 [151 P.2d 887]; *Guardianship of Brazeal*, 117 Cal.App.2d 59, 60 [254 P.2d 886]; *Wantz* v. *Union Bank & Trust Co.*, 137 Cal.App. 98, 102 [29 P.2d 882, 31 P.2d 826]; 4 Cal.Jur.2d, § 487, p. 323; 3 Witkin, California Procedure, § 154, p. 2340.)

The attorney general's brief relies in part upon the claim that it was stipulated that Nelly Grand did act as a real estate licensee for compensation. The written stipulation which was filed at the commissioner's hearing says: "[T]hat the following facts and allegations in said Amended Accusation are true and that no further proof will be required thereof." Paragraph VI of the stipulation says: "That the year in Line 16 of Paragraph VIII is changed to '1953' instead of '1954,' and further, in Line 17 of the same paragraph, that the word 'respondent' may be stricken." Fairly construed this was an adoption of said paragraph VIII as corrected. Said paragraph VIII, to which reference is thus made, reads: "That during the month of April 1954 respondent NORMAN NATHAN GRAND had in his employ his brother, respondent HOWARD GRAND, his mother, Verna Grand, and respondent NELLY FERRERA, who is now his wife and known as NELLY GRAND; that each and all of said persons negotiated with prospective tenants and with landlords in said rental business and received compensation therefor from respondent NORMAN GRAND; that each and all of said persons were not then licensed as real estate salesmen."

Paragraph IX of the stipulation relates to paragraph XII of the amended accusation, which paragraph does not mention the subject of compensation. Paragraph IX of the stipulation in its present condition is as follows: "As to Paragraph XII that Nellie Grand, wife of respondent Norman Grand, then known as 'Nellie Ferrera', while employed by respondent Norman Grand for a compensation therefor, and while not

licensed by the Division of Real Estate interviewed, filled out registration cards, and accepted registration fees from the persons and on the dates so indicated, beginning on Line 22 in said paragraph.'' The striking of the words ''for a compensation therefor'' may be explained as the correction of an inadvertence, inasmuch as paragraph XII of the accusation makes no such allegation. Had the attorneys intended to negative the receipt of compensation they normally would not have stopped with elimination of ''for a compensation therefor'' but would have substituted the word ''without'' for the word ''for.'' They also probably would have made a change in the stipulation concerning paragraph VIII of the accusation had they been bent on saying that Nelly had acted without compensation. We conclude that the attorney general's reliance upon the stipulation as proof of receipt of compensation by Nelly is justified. ▮ Of course, a finding made contrary to a deliberate stipulation cannot stand in the trial court or upon appeal. (*Capital National Bank* v. *Smith,* 62 Cal.App.2d 328, 343 [144 P.2d 665]; *Munger & Munger* v. *McBratney,* 131 Cal.App.2d Supp. 866, 868 [280 P.2d 232]; *Haese* v. *Heitzeg,* 159 Cal. 569, 575 [114 P. 816]; *Steele* v. *Steele,* 132 Cal.App.2d 301, 303 [382 P.2d 171]; 23 Cal.Jur., § 12, p. 828. But the commissioner's appeal has additional substantial basis.

▮ On November 22, 1953, Norman and Nelly made the above mentioned contract with Mrs. Noy which reduced her compensation to 10 per cent of the net profit and expressly permitted Norman and Nelly to operate the rental service under the name '' 'Security Realty,' which name is duly licensed to the first party [Noy].'' The Grands were to have full management and control and were to receive 90 per cent of the net profit. They did carry on the business together. Nelly at that time had no license whatever. Obviously the business was conducted for compensation, and it was unlawfully conducted so far as Nelly was concerned because she was not licensed at all.

During an earlier period of operation of ''Guaranteed Rental Service'' in August of 1952, when Norman was confessedly operating without the blessing of any broker's name, Nelly opened a bank account where portions of the proceeds of the business were deposited, and the only authorized signatures were those of Norman and Nelly. This was an activity which was unlawful when conducted by her without any license.

In 1953 and early 1954, before obtaining any license, Nelly "interviewed, filled out registration cards, and accepted registration fees from the persons" specified in paragraph XII of the amended accusation, 21 specific instances. It was so stipulated. This was another series of violations of the law.

In arguing the appeal of Norman and William their counsel asserts that activities such as those just mentioned are purely clerical and routine and may be performed by one who does not hold any license. The above cited ruling of the attorney general (18 Ops. Cal. Atty. Gen. 191 (1951)) quotes the Real Estate Commissioner's description of rental agencies as follows: " ' (They) . . . solicit listings of vacancies for rent through classified advertisements in local newspapers, also via telephone. Upon receipt of information thus solicited, they assemble and classify it and then advertise it for sale at a fixed fee which they refer to as a "registration fee" usually in the amount of $5.00 (although it ranges up to $25). They apparently have no active or direct connection with bringing landlord and tenant together. It appears that they do not introduce landlords and potential tenants to each other or take part in any of the actual negotiations, such as discussions and settlement of the terms of any rental or leasehold transaction, and contend that they do not act as agents for either the owner or tenant and receive no compensation whatever except the registration fee. Their activities are apparently limited to office bookkeeping and clerical work. They do no field work, but sit in their offices, awaiting responses to classified advertisements they run in local newspapers which proclaim that they have an abundance of low-rent vacant rentals available in all sections of the city that will be furnished applicants upon payment of the required "registration or service charge fee." ' " Substantially the same set of facts was held in *Dyer* v. *Watson, supra,* 121 Cal.App.2d 84, 89, to require a broker's license. The written stipulation at bar shows that Nelly did all of these things except soliciting listings of vacancies, assembling and classifying the information and then advertising it for sale. Her work was a part of a broker's function, and she was required under the law to have a broker's or salesman's license. If Norman had had a broker's license, that would not have been enough to cover Nelly's activities. "No real estate license gives authority to do any act specified in this chapter to any person, other than the person to whom the license is issued." (§ 10157.)

 Section 10177, as amended in 1953, provided that the commissioner may suspend or revoke the license of any real estate licensee who has done any of the following: "(d) Wilfully disregarded or violated any of the provisions of the Real Estate Law or of Chapter 1 of Part 2 or of the rules and regulations of the commissioner for the administration and enforcement of the Real Estate Law and Chapter 1 of Part 2. . . . (f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license." (Stats. 1953, ch. 762, § 3, p. 2027.) Clearly, Nelly had violated the act prior to the issuance of a salesman's license to her in 1954, and had so conducted herself as to have warranted a denial of her application had the commissioner been apprised of her previous conduct. The language of subdivision (f) carries an implication that it covers acts antedating the application for a license; conduct occurring after issuance thereof could not in the nature of things have brought about a denial of the application.

That the provisions of section 10177 are not confined to acts committed while holding a license appears from a comparison of that section with section 10176. The latter sets forth nine different categories of conduct which may bring about suspension or revocation of license. Prior to amendment of 1953 the right to administer such discipline under section 10176 was limited to the doing of proscribed acts "while a real estate licensee." The amendment of 1953 (Stats. 1953, ch. 762, § 2, p. 2025) made certain changes in the section, but the phrasing "while a real estate licensee" was retained therein. By way of contrast, section 10177, which specifies additional grounds for suspension or revocation, contained this general language prior to 1953: "The commissioner may suspend or revoke the license of any real estate licensee, who within three years immediately preceding has done any of the following." By that year's amendment (Stats. 1953, ch. 762, § 3, p. 2026), the three-year limitation was removed (i.e. transferred to § 10101) but the introductory language was not otherwise changed. This section did not contain the words "while a real estate licensee" either before or after 1953. The context of subdivisions (a), (d) and (f)[3] indicates, as does the introductory language, that

---

[3]Section 10177 (Stats. 1953, ch. 762, § 3, pp. 2026-2027):

"(a) Procured a real estate license, for himself or any salesman, by fraud, misrepresentation or deceit, or by making any material misstatement of fact in an application for a real estate license."

"(d) Wilfully disregarded or violated any of the provisions of the Real

section 10177 includes conduct violative of the act though occurring before the issuance of the license which is the subject of a particular suspension or revocation.

In *Hall* v. *Scudder,* 74 Cal.App.2d 433 [168 P.2d 990], the court said at page 437: ''Once *the* license is issued, the licensee becomes subject to disciplinary procedure as to his acts and conduct committed while he is a real estate licensee and 'within the immediately preceding three years.' '' *Colonial Liquor Distributors* v. *O'Connell,* 295 N.Y. 129 [65 N.E.2d 745], is persuasive. It dealt with revocation of a liquor license based upon conduct occurring prior to the license period and under a procedure containing the following: '' '2. A license *may be* revoked for any of the following causes: ''(c) Violation of any provision of Chapter 478 of the Laws of 134 [sic] known as the Alcoholic Beverage Control Law.'' ' '' (P. 748.) The court said at page 749: ''The question of law presented is whether a license may be revoked for violations which occurred in a prior licensing period and were not discovered by the Authority until after the issuance of the license sought to be revoked. One can of course conceive of a situation in which a revocation for a long past offense would be an abuse of the Authority's discretion but clearly this is not such a case.'' And at page 750: ''The regulation authorized by statute specifies as cause for revocation 'Violation of any provision of the Alcoholic Beverage Control Law', and we may not limit the regulation by an absolute rule that no violation occurring before issuance of a renewal license is cause for revocation thereof. In this case the violations were of such a character and were so closely identified in time and circumstance with the business under regulation that we may not say that the revocation was without authority or in any way an abuse of regulatory power.''

Because of her violations of the act prior to her application for a license the commissioner properly could have denied Nelly's application. ''In these cases all that is required is that the commissioner have reasonable grounds to conclude that the applicant does not meet the conditions

Estate Law or of Chapter 1 of Part 2 or of the rules and regulations of the commissioner for the administration and enforcement of the Real Estate Law and Chapter 1 of Part 2.''

''(f) Acted or conducted himself in a manner which would have warranted the denial of his application for a real estate license.''

set forth in the statute.'' (*Glick* v. *Scudder,* 69 Cal.App.2d 717, 719 [160 P.2d 90].)

We have concluded that, for the reasons above stated, the granting of mandate as to Nelly Grand was erroneous.

The judgment is affirmed as to Norman Grand and William Grand and reversed as to Nelly Grand, who is named as Nellie Grand in the judgment herein.

Fox, P. J., and Herndon, J., concurred.