[Crim. No. 3560.   Third Dist.   Mar. 5, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. BARBARA BEAUGEZ et al., Defendants and Appellants.

Robert J. Nareau, under appointment by the District Court of Appeal, for Defendants and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Doris H. Maier, Assistant Attorney General, and Edward Hinz, Jr., Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—Defendants were convicted by a jury under an indictment charging them with "endangering the life or limb of a child, a violation of Section 273a of the Penal Code of the State of California, in that on or about the 28th day of October, 1963 . . . they were the persons who wilfully permitted a child, to wit: Jerry E. Beaugez, Jr., age 5 months, to be placed in such situation that its life or limb might be endangered." The trial court denied defendants' motion for a new trial and thereafter ordered that both defendants be granted probation for a period of three years, judgment and sentence being suspended during defendants' compliance with the terms of probation. The notice of appeal "from the judgment and sentence pronounced and rendered" will be treated as an appeal from the order granting probation. (Pen. Code, § 1237, subd. 1; *People* v. *Robinson,* 43 Cal. 2d 143, at p. 145 [3] [271 P.2d 872]; Cal. Rules of Court, rule 31.)

On appeal defendants argue 17 contentions of prejudicial error, only four of which merit discussion. The rest are either

duplicative, redundant, or raise propositions so obviously unsound that they should, and will, be disregarded.

The contentions we discuss are: (1) insufficiency of the evidence to support the verdict, (2) that the portion of Penal Code section 273a under which defendants are charged is void for vagueness, (3) that the jury's verdicts were coerced by the court, and (4) that questioning of a psychiatrist called by defendants was improperly circumscribed by the trial court. Although we reject all contentions, the point that the statute is so uncertain as to violate due process has sufficient substance that we deem treatment thereof to have possible future, citable value.

Preliminarily, we discuss the contention that the evidence is insufficient to support the verdicts. Argument on this point is prefaced by the statement: "In order that the Court fully appreciate this ground of appellants' contentions a reading of the entire transcript of the case becomes necessary." That is not our obligation. (*Grand* v. *Griesinger*, 160 Cal.App.2d 397, 403 [325 P.2d 475]; *Devers* v. *Greenwood*, 139 Cal.App.2d 345, 351-352 [293 P.2d 834]; *Fox* v. *Erickson*, 99 Cal.App.2d 740, 742 [222 P.2d 452].) Appellants' brief contains a two-page statement of facts, completely inadequate as the basis of an insufficiency-of-evidence appeal. Rule 15 (a) is disregarded.[1] Nevertheless, we have examined the record. The facts, sufficient to make the discussion to follow meaningful, are these:

On August 24, 1963, defendant Jerry E. Beaugez took his son, Jerry, Jr., then 3 months old, to the Sacramento County Hospital. His stated reason was that he had inadvertently caused a milk bottle to fall upon the child, producing swelling and bruises on and around the nose and in the periorbital area. Examination by the doctor at the hospital, however, disclosed numerous other bruises and abrasions: in the midportion of the back, the right shoulder, the left cheek and the scalp. There was evidence of bleeding (seemingly internal) about the ribs. The baby was irritable and had a high-pitched cry. He was pale, mottled and lethargic. There was a pinkish discharge from the child's nostrils. After a five-day stay, the child (because the parents lived in Yolo County) was removed to the Yolo County General Hospital. Examination there produced findings similar to those at the Sacra-

---

[1] California Rules of Court, rule 15(a), provides *inter alia*: "The statement [in a brief] of any matter in the record shall be supported by appropriate reference to the record."

mento County Hospital. The impression upon entry was "possible physical abuse." X-rays taken revealed a calloused fracture in the mid-clavicular region. This could have been sustained during birth. The medical testimony was sharply conflicting as to whether the X-rays also showed rib fractures. The prosecution's radiologist stated they did; defendants' orthopedist, Dr. Herbert Sanderson, stated they did not, nor did X-rays taken at his direction just before the trial.

The child remained in the hospital for approximately six weeks. Although the parents had contended the child bruised easily, observation during the six-week stay in the hospital showed no evidence of this. The baby was in good health when discharged.

The child was discharged to his parents. They brought him back again on October 28, 1963, for a condition which X-rays disclosed to be a spiral fracture of the left humerus. At the trial defendants produced a witness, defendant Barbara's sister, Deloris Woolsey, who attempted to account for this. She described an incident in which she, having noted a discoloration of the child's arm, attributed to a "pinched nerve," had rotated the child's arm to start blood circulation. She also testified that she had then put the child's arm in a sling and had placed him in a stroller from which he had accidentally fallen onto the pavement. The jury could have received this testimony as an explanation of the fractured arm with great dubiety. Examination by the admitting physicians at the hospital showed that the fracture had resulted from a very *severe* twisting motion. (Even defendants' expert had stated it was possible but not probable that the fracture had been caused in the manner described.)

The defenses at the trial were: (1) the fracture of the clavicle was produced at birth, (2) the badly swollen and bruised nose and eye were explained by the testimony of the father who, as stated above, said he had accidentally knocked over a milk bottle; (3) the other bruises were said to have been produced by a fall from a davenport when the child was 3 weeks old (but Barbara stated this had produced no bruises and no one attempted to account for bruises from this cause existing two months later). The scalp condition was stated to have been caused by the child's rubbing his head while lying in a bassinet (but again Barbara's testimony was vague and indefinite as to the parts of the child's body involved); (4) Carroll Brown, Barbara's mother, described an incident during her care of the child when she had struck the child to

stop a choking spell; (5) The attempt to explain the spiral arm fracture was as stated above. Without attempting further detail, we think it may be fairly stated that the testimony of defendants and their witnesses was in many respects inconsistent, contradictory and unbelievable. While the evidence against defendants was circumstantial, the inferences reasonably to be drawn therefrom not only justified the jury's verdicts and therefore preclude interference by a reviewing court therewith (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]), but also these inferences point so conclusively to the guilt of the defendants that it would be difficult to conceive how a jury could have found the defendants innocent.

■ The principal contention of defendants is that the portion of Penal Code section 273a under which they were charged is void for vagueness.

Section 273a of the Penal Code provides as follows: "Any person who willfully causes or permits any child to suffer, or who inflicts thereon unjustifiable physical pain or mental suffering, and whoever, having the care or custody of any child, causes or permits the life or limb of such child to be endangered, or the health of such child to be injured, and any person who willfully causes or permits such child to be placed in such situation that its life or limb may be endangered, or its health likely to be injured, is punishable by . . . ."

■ In *People* v. *McCaughan,* 49 Cal.2d 409, the court (per Justice Traynor) on page 414 [317 P.2d 974], quoting from *Connally* v. *General Const. Co.,* 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322], said: " ' . . . [A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.' "

■ The opinion also observes (on page 414): " . . . A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it. [Citations] . . . ■ A statute will . . . be upheld, despite the fact that the acts it prohibits are defined in vague terms, if it requires an adequately defined specific intent. [Citations] ■ A court, however, may not create a standard (*Lanzetta* v. *New Jersey, supra,* 306 U.S. 451 [59 S.Ct. 618, 83 L.Ed. 888]; *Connally* v. *General Const. Co., supra,* 269 U.S. 385), and a specific intent defined

in the same vague terms as those defining the prohibited acts does not make a statute acceptably definite.''

Penal Code section 273a reaches three types of offenders in their conduct relating to children: (1) the person who *wilfully* inflicts unjustifiable physical pain or mental suffering upon a child or causes or permits him to suffer; (2) the custodian of a child who causes or permits the child's life or limb to be endangered or his health to be injured, or (3) the person who *wilfully* causes or permits a child to be placed in such a position that its life or limb ''may be endangered or its health likely to be injured.''

In a case falling within the first of the three categories, *People* v. *Curtiss,* 116 Cal.App.Supp. 771, at pp. 778-781 [300 P. 801], the court (per Yankwich, J.) upheld its provisions against the attack that it was insufficiently certain in its definition of a criminal act. Likening its terms and testing its validity by the ''rule of reason'' (applied in *Ex parte Daniels,* 183 Cal. 636, at p. 647 [192 P. 442, 21 A.L.R. 1172]),[2] to the Vehicle Act provision making it unlawful to travel at ''an unreasonable or unsafe speed,'' Judge Yankwich observed on page 781: ''Reasonableness as the standard of an act—which can be determined objectively from circumstances—is a common widely used, and constitutionally valid standard in law.''

The charge here falls within the third category of prohibited conduct, i.e., the wilful creating of a situation where the life or limb of a child may be endangered or his health injured.

The type of conduct which this portion of the statute seeks to reach defies precise definition. In number and kind the situations where a child's life or health may be imperiled are infinite. Yet the aim of the statute is not obscure and its objective is a salutary social one. It seeks to protect children from wilful mistreatment whether directly or indirectly applied. The portion of the statute which we construe relates to indirect mistreatment. Frequently it is the only sort of child abuse that can be proved. Unhappily it is a matter of common knowledge that badly mistreated children are received as county hospital patients daily. Because, in most cases, abuse occurs in the privacy of the home, proof of

[2]The Supreme Court per Wilbur, J., in *Ex parte Daniels, supra,* took its ''rule of reason'' from the *Standard Oil* case, 221 U.S. 1 [31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A. N.S. 834], upholding the validity of the anti-trust law because that law was not a denial of all restraint of trade, but only a denial of an unreasonable restraint of trade.

the actor directly responsible is, more often than not, impossible. If children are to be protected against such mistreatment, responsibility must be fixed upon those indirectly responsible—those who wilfully permit situations to exist which imperil children. Although the language of the statute is broad and the prohibited behavior is very general, this seems *necessary* in the nature of its subject matter. In *People v. Yates,* 114 Cal.App.Supp. 782 [298 P. 961], the court considered a similar complaint against a former version of Penal Code section 270, which penalized the father of a child "who wilfully omits without lawful excuse to furnish necessary food, clothing, shelter or medical attention," etc. Against the contention that the statute was void for vagueness, the court said on page 789: "In the nature of things no specific and precise rule can be made on the subject [i.e., of that which is 'necessary']."

By giving the word "wilful" its accepted statutory meaning and by applying the "rule of reason" to the provision as a whole, we think sufficient clarity emerges to "provide a standard of conduct" to guide the guardian of the child against commission of the offense and to guide the trier of fact in determining guilt. As stated in the comment in 41 California Law Review 523, 525, regarding the "rule of reason" or "reasonable man test," "This type of inquiry has been the rationale for upholding many statutes which by their very nature and subject matter could not be more clear." (Citing *People v. Yates, supra.*)

First we consider the meaning of the word "willful." By dictionary definition "willful" can either mean at one extreme "governed by will without yielding to reason or without regard to reason: obstinately or perversely self-willed," or it can be used synonymously with "intentional" or "voluntary." (Webster's Third New International Dictionary, Unabridged.)

Penal Code section 7, subdivision 1, defines "willfully" *"unless otherwise apparent from the context* . . . when applied to the intent with which an act is done . . . [as implying] simply a purpose or willingness to commit the act . . . . It does not require any intent to violate law, or to injure anyone . . . ." (Italics supplied.) (See *People v. Hicks,* 222 Cal. App.2d 265 [35 Cal.Rptr. 149].)

Within that definition (which was the definition given to "willful" by the trial court here in its instructions to the jury), and since another meaning is not "otherwise apparent

from the context,"[3] we construe "willfully" as used in Penal Code section 273a to mean "purposeful" or "with knowledge of consequences." And by applying the "rule of reason"[4] to the whole provision we construe its meaning as a whole to condemn the intentional placing of a child, or permitting him to be placed, in a situation in which serious physical danger or health hazard to the child is reasonably foreseeable. This is the construction of intent which the context of the statute as a whole justifies, and so construed we find it not void for vagueness.

Appellants urge that under the wording of the statute a parent might be prosecuted for permitting a child to go swimming or for sending him on an errand along traveled streets to a grocery store. But such conduct (assuming it to be applied as regards a child of suitable years to run errands or go swimming) would not justify prosecution under a common sense interpretation of the statute. In *People* v. *Bucse*, 220 Cal.App.2d 802, we stated at page 806 [34 Cal.Rptr. 102]: "[C]ourts will not give strained meanings to legislative language, torturing that which is clear (or can be made clear by common sense interpretation) into opacity through a process of imaginative hypothesizing."

Defendants also contend that the jury's verdict was coerced by the court. The facts upon which the claim is predicated are these: The jury retired at 2 p.m. It was sent out for dinner. Upon its return and after about two hours more of deliberation (i.e., at 9:40 p.m.) the jury returned to the courtroom, the foreman stating that all reasonable probability of reaching a verdict had been exhausted. With-

---

[3]It is stated in 1 Witkin on California Crimes (1963) section 57, page 62, that the statutory definition we have given of "willful" is not "generally applied in interpreting a statute dealing with true crimes which traditionally involve mens rea. In these cases, the words 'wilful' or 'wilfully' used alone or with words of similar import, may be construed to require a guilty mind or intent. [Citations.]" But in this regard, a distinction must be made between a crime which is one of the "public welfare offenses" and a crime which is a "codified common-law offense." The latter calls for general criminal intent, the former—and we deem this to be one of such—usually requires only the intentional doing of the act with knowledge of its potential consequences. (See Hall, General Principles of Criminal Law (2d ed.) pp. 71, 72; Witkin, *op. cit.*, § 58, p. 62, "Knowledge.") Differentiation in this field becomes difficult and esoteric. For the purposes of this opinion such close refinement seems unnecessary.

[4]The so-called "rule of reason" sometimes referred to as the test of the "reasonably prudent man," or of the man of "common intelligence" has been applied not only in *People* v. *Curtiss, supra, Ex parte Daniels, supra,* and *Standard Oil, supra,* but also in a number of other cases collected by an article in 41 California Law Review 523, at p. 525.

out indicating in whose favor, he said the jury stood at nine to three. The court said: "[T]his case has taken seven days to try, and I am very anxious to have you reach a verdict if it is possible for you to do so consistent with your conscience and the law as I have stated it to you. If you are unable to reach a verdict, it may be necessary to retry the case, spend another seven days of trial and the corresponding expense and inconvenience and delay in a decision being made." Five jurors then indicated they thought there was no reasonable probability of a verdict. The court sent them back for further deliberation.

At 11:49 p.m. the jury returned. The foreman then indicated that the jury stood at ten to two, five indicating by a show of hands no probability of a verdict, seven that a verdict *was* probable. The court stated: "I am reluctant to declare a mistrial and say, well, we will try it again if necessary. I am also reluctant to keep you because the law requires that you be kept together until you reach a verdict or until a mistrial is declared in a criminal case. So, that means I would have to . . . return you to the custody of the bailiff to be kept in a hotel tonight, and from the looks of the amount of luggage that is at your disposal, . . . you are ill-prepared for this. However, it appears to me that in the interests of justice and of efficient judicial administration that is what I should do."

The foreman, however, indicated he felt that most of the jurors would rather "take another crack at it." Eleven jurors then voted in favor of continuing deliberations. The jury retired and returned at 12:59 a.m. with the verdicts.

It is proper for the court to inquire as to the numerical division of the jury without seeking to discover in whose favor the vote stands. (*People* v. *Lammers,* 108 Cal.App.2d 279 [238 P.2d 667].) And it is not error for the court in ordering the jury to retire for further deliberation to add that they may be held over at a hotel if a verdict is not reached. (*People* v. *Boyden,* 181 Cal.App.2d 48 [4 Cal.Rptr. 869].) Urging a jury to attempt to reach an agreement or ordering them to retire for further deliberation is also permissible where the language used does not contain an element of coercion to reach a particular verdict. (See Witkin, Cal. Criminal Procedure, § 526, p. 537, and cases cited.)

There is a statement in *People* v. *Crowley,* 101 Cal.App.2d 71, at pages 78-79 [224 P.2d 748], that a premature statement that the jury would be "locked up for the night" might be

660

regarded as improper (there reversal for coercion was for another reason), but in *Crowley* the statement had been made at 5 p.m. Here it was made at 11:49 p.m., after the jury had been out since 2 p.m.

We can find nothing in the transcript giving any indication that the judge was aware when he made the statements quoted that first nine and later ten of the jury were voting *for conviction*. And we do not believe it would be proper for us, or that it would have been proper for the trial judge, to assume that fact upon the theory that obstinate minority "hold-outs" are usually for acquittal. Therefore, we cannot conclude that the judge's statements were made, or his reluctance to declare a mistrial motivated, by either a belief or hope that an ultimate conviction would result. Nor did he indicate in any way that he possessed such belief or hope. We find no coercion.

We do advert, however, to that portion of the trial judge's remarks quoted above wherein the jury was advised that if it did not reach a verdict the case might have to be retried, that retrial might consume another seven days of court time and that this would be an expensive process. While we do not believe, under the circumstances here that this statement constituted coercion, neither do we approve the remark. Had the judge restricted admonition to a statement that the trial had been long and the volume of evidence so great or complex as to suggest longer deliberation in an effort to reach decision, no criticism would attach. The statement as given, however, might be construed to suggest that a jury which had fully and fairly analyzed the evidence and which had exhausted all possibility of honest agreement, should compromise for reasons of expediency, i.e. the cost of retrial. That obviously would be an improper basis for decision.

Defendants' last contention which justifies comment is that their direct examination of an expert witness was improperly circumscribed. The witness was Dr. Rood, a psychiatrist. Defendants had pleaded not guilty and not guilty by reason of insanity. (After the trial herein the latter plea was withdrawn.) Dr. Rood had been appointed by the court to examine defendants in connection with the plea of insanity. He was called by the defense to testify. Defense counsel asked the witness his opinion based upon his examinations as to whether the defendants had the ability wilfully to cause their child's life or limb to be endangered. The district attorney objected, and the court called for argu-

ment outside the presence of the jury. Defense counsel urged that it was proper to consider psychiatric testimony regarding the element of ''willfulness'' under the rules stated in *People* v. *Wells*, 33 Cal.2d 330 [202 P.2d 53], and *People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492].[5] After argument the court announced that it would overrule the People's objection and admit the testimony. The prosecuting attorney (still outside the presence of the jury) then challenged the purpose of the examination as not being within the scope permitted by the *Wells* and *Gorshen* rules. He referred to a report of the physician, not before the court, and not before us on appeal, which he said would demonstrate this. Defense counsel was then asked by the judge to state the nature of the testimony sought to be elicited from the witness. Defense counsel then said: ''I feel that I am being forced to disclose part of the defense before the defense has been entered.'' In reply to this, the court stated that the examination could proceed and he would rule on admissibility as evidence was offered. The jury was recalled and the question regarding defendants' ability to harm their child wilfully was put as above stated. To it the witness answered: ''Well, I don't think that they had any mental illness or disease or incapacity that would make it impossible for them to decide to do a wrongful act.''

Defense counsel later asked the broad question: ''Now, on the basis of this examination, will you tell me what your findings were in this regard.'' The psychiatrist, after repeating his previous statement that the defendants had capacity to wilfully injure the child, then volunteered that during his examination he had ''learned about these people and have opinions about their nature and the nature of their life together and the nature of their life with their children and from that point of view——'' At that point the answer was interrupted by an objection from the prosecuting attorney and the objection was sustained. Without further exploration of what the expert might have been trying to say, defendants' counsel terminated the direct examination.

Sustaining the objection was not error. Even assuming that proof of a specific mental state was involved, and that psychiatric testimony, properly limited, was admissible in this

---

[5]The *Gorshen* case ''stands for the proposition that psychiatric testimony that negates the specific mental state essential to a particular crime is relevant and admissible as a 'partial defense.' '' (The quotation is from the opinion of Justice Traynor in *People* v. *Modesto*, 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].)

type of case, a point which we do not decide, the question was too broadly and vaguely framed and the interrupted answer was nonresponsive to its apparent meaning. It also appeared to be, at least superficially, outside the scope of competent expert testimony. Observations by a psychiatrist regarding the defendants' family life, unless related to relevant opinions negating the mental state essential to a specific crime (see fn. 5, *supra*), are irrelevant. No proper question within the limits of admissible inquiry was ever addressed to this expert. Defense counsel had expressly refused to divulge to the court what he expected to prove from the witness (thus making it impossible for the trial judge to know just what the witness *was* driving at) and counsel's peremptory termination of the examination seemed to constitute a recognition that there was NO competent testimony this expert could have given.

As stated above, the other contentions by defendants are insubstantial and require no discussion.

The order is affirmed.

Friedman, J., and Sparks, J. pro tem.,* concurred.

A petition for a rehearing was denied March 31, 1965, and appellants' petition for a hearing by the Supreme Court was denied April 28, 1965.

.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.