**In re Hubert Beckwith GRABAU, aka H. Beck Grabau, Debtor.**

**In re Vincent E. BROWN, Debtor.**

**Yeshwant S. and Vinaya Y. RANADIVE, et al., Plaintiffs,**

**v.**

**Hubert Beckwith GRABAU, Defendant.**

**Yeshwant S. and Vinaya Y. RANADIVE, et al., Plaintiffs,**

**v.**

**Vincent E. BROWN, Defendant.**

**Bankruptcy Nos. 589–00053–MM, 586–05851–ASWCZ. Adv. Nos. 900120, 880394.**

United States Bankruptcy Court, N.D. California.

Sept. 4, 1991.

Henry B. Niles, III, Santa Cruz, CA, for defendant, Vincent E. Brown.

John N. Pope, Jr., San Jose, CA, for defendant, Hubert Beckwith Grabau.

James D. Sumner, San Jose, CA, for plaintiffs, Yeshwant S. and Vinaya Y. Renadive.

## MEMORANDUM OPINION

MARILYN MORGAN, Bankruptcy Judge.

### I. *Introduction*

Plaintiffs seek to have their claims against defendants determined nondischargeable under 11 U.S.C. § 523(a). A trial was held on June 17th, 19th, 20th, and 21st. At the close of plaintiffs' case, counsel for Mr. Brown moved for a directed verdict. Based upon the pleadings submitted, evidence presented, and argument of counsel, Mr. Brown's motion is DENIED. Further, the court finds plaintiffs' claims against Mr. Brown nondischargeable pursuant to § 523(a)(4). With respect to Mr. Grabau, the court finds that plaintiffs' claims are dischargeable.

### II. *Facts*

Defendants H. Beck Grabau and Vincent Brown were employees of Allstate Investment Company. Allstate was in the loan brokerage business. Allstate generated commission income by matching its investors with its borrowers. As a result of borrower defaults, Allstate's trustee corporation foreclosed on the properties pledged by defaulting borrowers. Thus, it acquired an inventory of real estate owned properties for the account of its investors.

Mr. Brown was a licensed real estate broker for about 15 years when he became the designated real estate broker for Allstate. Mr. Brown became the owner of 51% of Allstate stock in May, 1981 and sold the stock when he ended his employment with Allstate in June, 1982. He allowed himself to remain as the "broker of record" until September, 1982 when Mr. Grabau took over as designated broker.

As a salesman for Allstate, Mr. Grabau held himself out as an investment advisor specializing in pension and profit sharing plans. He received his real estate license in December, 1981. Mr. Grabau first acquired an ownership interest in Allstate in April, 1981 and increased his interest in February, 1982.

In late 1981, Allstate was in serious financial trouble. The Department of Real Estate conducted an investigation and audit of Allstate's affairs in December, 1981, and concluded that Allstate was out of trust at least $350,000. In response to Allstate's financial problems, the president of Allstate, Lee Danna, developed a plan to generate cash quickly by selling fractional interests in various real estate owned properties.

Mr. Danna prepared a sales package indicating that Allstate was the owner of all the properties, the properties were suitable to rent, and the investors would receive a fractional interest in the actual title to the property as well as substantial returns on their investments. Under the agreements prepared by Allstate at Mr. Danna's instruction, Mr. Grabau sold fractional interests to seven of the plaintiffs for a total of $92,000.00. The three remaining plaintiffs invested $177,750.00 through Allstate representatives other than Mr. Grabau.

In fact, Allstate never acquired title to the properties. Allstate over-stated the suitability of the property for rental purposes. The plaintiffs did not receive any interest in the title to the properties, nor did they receive any return on their investment. Their funds were commingled with other Allstate funds, and remain unaccounted for. Mr. Grabau did not know that the properties had title problems until several months before taking over as designated broker in September, 1982.

The commingling of funds resulted from the lack of adequate operating procedures

governing transactions involving the real estate owned properties. Mr. Brown assumed that the standard procedures used for other transactions would be applied to the real estate owned properties. These procedures included obtaining current appraisals, obtaining preliminary title reports, and reviewing private loan documents. This information would then be reviewed by members of Allstate's loan committee, which included Mr. Brown.

However, these procedures were not applied to the transactions involving the real estate owned properties. At the time of these transactions, Mr. Brown took a six week leave of absence from Allstate because of flooding in Soquel, where he resides.

### III. *Discussion*

Mr. Brown's motion for a directed verdict is based on the holding in *Walters v. Marler*, 83 Cal.App.3d 1, 147 Cal.Rptr. 655 (1978). The plaintiffs in that case brought suit against the designated broker of a corporate licensee seeking damages for negligent misrepresentations made by the corporation's salesman. Relying on Miller & Starr's treatise on California real estate law for the proposition that general agency law governs the rights and liabilities of a real estate broker, the court concluded that a designated broker could not be held individually liable for the failure to adequately supervise a corporate licensee's salesmen.

The reasoning of *Marler* is inconsistent with the purpose of the statutory scheme governing real estate licensees, particularly in light of amendments to the real estate act subsequent to the *Marler* decision. In interpreting the real estate act, codified at California Business and Professional Code § 10000 *et seq.*, California courts have looked to the general purpose of the act of which the statute is a part, as well as the specific purpose of the statute itself. *Lorenz v. Sauer*, 807 F.2d 1509, 1512 (9th Cir.1987).

■ The primary purpose of the real estate act is to raise the standards of the real estate profession by requiring fair and ethical behavior by its members towards their clients. *Lorenz*, 807 F.2d at 1512 (citing *Middelsteadt v. Karpe*, 52 Cal.App.3d 297, 124 Cal.Rptr. 840, 843 (1975)). The legislation is intended both to protect consumers and encourage the real estate profession to pursue high standards. *Andrepont v. Meeker*, 158 Cal.App.3d 878, 204 Cal.Rptr. 887, 891 (1984).

■ Under California Business and Professions Code § 10211, a corporation that is licensed as a real estate broker is required to appoint an individual also licensed as a broker as its "designated real estate broker." Section 10159.2 provides that the designated real estate broker is responsible for the supervision and control of the activities conducted on behalf of the corporation by its employees as necessary to secure full compliance with the real estate laws. *Norman v. Dept. of Real Estate*, 93 Cal. App.3d 768, 155 Cal.Rptr. 715, 720 (1979).

Construing §§ 10211 and 10159.2 in light of the general policies of the real estate act, the court concludes that a designated broker is responsible to members of the public who have suffered financial harm as a result of the designated broker's failure to adequately supervise the corporation's salesmen. To hold otherwise would defeat the statute's purpose by reducing real estate licensees' accountability to the public for acts falling below the desired level of professional conduct.

The court in *Jory v. Bennight*, 91 Nev. 763, 542 P.2d 1400 (1975), reached the same conclusion. The Supreme Court of Nevada in *Bennight* interpreted a real estate licensing law similar to the California statute. The plaintiff in *Bennight* sued the designated broker of a corporate licensee for breach of his fiduciary duties. The court found "untenable" the argument that a real estate broker can absolve himself of all fiduciary responsibility normally owed to the public by electing to conduct his activities on behalf of a corporation. The court reasoned:

Use of the corporate structure to evade legal obligations and defeat public policy is not favored. [citations omitted] Moreover, it seems clear our legislature,

in permitting the business of real estate brokerage to operate in corporate form, had no intent to relieve brokers of pro- fessional responsibility. Instead, the legislature has provided that a broker's license will be issued, not alone to a corporation as such, but only to a qualified officer on behalf of the corporation. [citation omitted] We are, therefore, concerned with the obligations and liability of a corporate officer who is licensed to carry out the corporation's duties as a broker.

In urging that Edward Jory owed no duty to Bennight we think appellants misconstrue Jory's status. He remained a real estate broker, although licensed to serve clients on behalf of a corporation. Like any broker, Jory had fiduciary duties to those he had undertaken to serve in a professional capacity, including a duty "to act in the utmost good faith," and "to disclose to his principal facts within or which may come to his knowledge which might influence the principal in the transaction." [citation omitted] Therefore if Jory, through his own professional misconduct or neglect, breached fiduciary obligations owed to Bennight, he is personally responsible for consequent harm, and operating in the corporate form does not insulate him from such liability. [citation omitted]

*Id.*, 542 P.2d at 1403.

The reasoning of the *Bennight* court is consistent with the legislative history of § 10159.2. That section was added to the real estate act by amendment in 1979. An analysis of the proposed amendment by the Assembly Committee on Labor, Employment, & Consumer Affairs states:

1. The licensing of corporate "persons" has always been problematic: the state is confronted with the dilemma of guaranteeing the professional competence and proficiency of a legal fiction. Traditionally, the problem is resolved by requiring the direct supervisory control of the corporation's professional actions by a licensed individual who is himself qualified. This is meant to ensure that the corporation knows how to do the job. It is difficult for the state to guarantee the

active supervisory role of the licensed individual, however; while a person might be the "designated officer" or the "responsible managing officer", he or she might only be lending a name and license number to the corporation.... *The only way that the active participation of the licensed individual can be ensured is by "piercing the corporate veil" and making the individual licensee vulnerable to action on account of corporate misdeeds, or on account of failure to fulfill corporate responsibilities.*

2. Under the terms of the law, real estate brokers are responsible for supervising the activities of their salespersons and employees. The corporate licensee, as a broker, has a similar responsibility, which it cannot fulfill. A paper entity cannot supervise.

3. The granting of the corporate license is predicated upon the qualifications of the designated officer in the first place. *It is no injustice to demand that the person standing for the corporation at licensing continue to stand for the corporation. That is an implicit assumption of the law anyway.*

Ass. Comm. on Labor, Employment, & Consumer Affairs, Bill Lockyer, Chairman; Statement on A.B. 985, sponsored by Thomas Hannigan; (1979) [emphasis added].

In light of the purpose of the California real estate act and the 1979 amendments to the act, the court concludes that a designated broker is personally liable for his failure to adequately supervise his salesmen. Mr. Brown's motion for a directed verdict is, therefore, denied.

■ The plaintiffs argue that the liability of Mr. Brown and Mr. Grabau should be declared nondischargeable pursuant to § 523(a)(4). The elements for nondischargeability must be proved by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, ——, 111 S.Ct. 654, 660, 112 L.Ed.2d 755 (1991). The plaintiffs' § 523(a)(4) claim requires a two-pronged determination as to (1) whether the defendants were acting in a fiduciary capacity,

and (2) whether the defendants committed a "defalcation" in that capacity. *In re Hatfield,* 1991 WL 498925, 1991 U.S. Dist. LEXIS 7382 (N.D.Cal., May 13, 1991).

█ In this case, Allstate was a corporate licensee, and Mr. Brown was the designated real estate broker for Allstate. He was responsible for Allstate's dealings with the plaintiffs, and had a duty to ensure that their investments were properly accounted for. Thus, for purposes of § 523(a)(4), he was acting as plaintiffs' fiduciary. *In re Woosley,* 117 B.R. 524, 529 (9th Cir. BAP 1990).

Furthermore, the following excerpt from Mr. Brown's testimony demonstrates that he was aware of this duty:

Q: Was Mr. Grabau one of the licensees you were supervising or were supposed to be supervising as a designated broker of Allstate?

A: Yes. Whatever he did pertaining to real estate. Like I said, most of his duties did not require a real estate license.

Q: But these agreements do pertain to real estate, correct?

A: It's a sale of our property. Something I should probably look over, yeah.

█ As a fiduciary, he is liable for defalcation while acting in that capacity. Defalcation is broadly defined to include "the failure of a fiduciary to account for money he received in his fiduciary capacity" regardless of the fact that such failure may have resulted from ignorance or negligence. The term covers cases where there was no fraud, embezzlement, or willful misappropriation on the part of the debtor. *Hatfield,* 1991 WL 498925, 1991 U.S. Dist. LEXIS 7382. Therefore, Mr. Brown's liability for failing to account for the plaintiffs' investments is nondischargeable.

█ California law distinguishes between "brokers" and "salesmen." *Compare* § 10131 *with* § 10132. The broker is authorized to deal with the public, contract with its members and collect money from them, because of his "superior knowledge, experience and proven stability." *Grand v. Griesinger,* 160 Cal.App.2d 397, 325 P.2d 475, 481 (1958). "The salesman, on the other hand, is strictly the agent of the broker; he cannot contract in his own name, nor accept compensation from any person other than the broker under whom he is licensed." *Id.*

█ Although Mr. Grabau became a licensed broker in December, 1981, the evidence indicates that he was acting as a salesman, and not a broker. Unlike Mr. Brown, Mr. Grabau was not the designated real estate broker. As Mr. Brown's testimony indicates, "most of [Mr. Grabau's] duties did not require a real estate license." Further, Allstate did not procure an additional license pursuant to § 10158 for Mr. Grabau to act as a broker. Rather, Mr. Grabau traded on Mr. Brown's license as an agent for Allstate. The court concludes, therefore, that Mr. Grabau was not acting as a fiduciary.

█ Some of the plaintiffs allege, nonetheless, that they had prior dealings with Mr. Grabau. As a result of their prior transactions, they claim that Mr. Grabau was a fiduciary because of the trust they placed in him. However, the broad, general definition of fiduciary—a relationship involving confidence, trust and good faith—is inapplicable in the dischargeability context. *Woosley,* 117 B.R. at 529. Mr. Grabau is, therefore, not a fiduciary under § 523(a)(4).

█ Moreover, plaintiffs' claim that Mr. Grabau induced them into making the investments with false representations concerning Allstate's purported ownership of the properties and the interests they were supposed to receive. The evidence indicates that Mr. Grabau was not personally familiar with the facts surrounding the ownership of the properties. Rather, he accepted as true the representations of his principal, Mr. Danna. Consequently, he did not make the false misrepresentation knowingly or with intent to deceive, which is required for a finding of nondischargeability under 11 U.S.C. § 523(a)(2). *In re Rubin,* 875 F.2d 755, 759 (9th Cir.1989).

█ With regard to Mr. Ranadive's claim that Mr. Grabau made false represen-

tations to him, the evidence indicates that Mr. Grabau provided assurances to Mr. Ranadive. However, these representations were made after Mr. Ranadive had provided his investment funds to Allstate. Thus, Mr. Grabau's representations did not actually cause Mr. Ranadive's loss, which is another element of fraud under § 523(a)(2). *Rubin,* 875 F.2d at 759.

## IV. *Conclusion*

During the trial of this case, it became clear to the court that everyone in this litigation suffered significant financial losses as a result of the failure of Allstate. In certain instances, the risk of loss is borne by the investor. In other situations, the law dictates that liability be borne by specific individuals.

The law directs the court in this particular case to conclude that Mr. Brown was plaintiffs' fiduciary as the designated broker for Allstate, and that it was his responsibility to account for their funds. Therefore, the plaintiffs' claim for $269,750 against Mr. Brown is nondischargeable pursuant to § 523(a)(4). Because Mr. Grabau was acting only as a salesman, however, plaintiffs' claims against him are dischargeable.