**In re Henry Z. SPECTOR t/a Spector Construction Company and Monica S. Spector, Debtors.**

**James B. ROLLEY and David M. Salkowski, Plaintiffs,**

**v.**

**Henry Z. SPECTOR and Monica S. Spector, Defendants.**

**Bankruptcy No. 91–10073S.**
**Adv. No. 91–0275S.**

United States Bankruptcy Court, E.D. Pennsylvania.

Nov. 29, 1991.

John L. Jenkins, Philadelphia, Pa., for debtors.

Kenneth F. Carobus, Philadelphia, Pa., Trustee.

David L. Narkiewicz, Lansdale, Pa., for plaintiffs.

Frederic Baker, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

We herein consider, at some length, whether a general partner, vis-a-vis his other partners, "acts in a fiduciary capacity" within the meaning of those terms in 11 U.S.C. § 523(a)(4) of the Bankruptcy Code under Pennsylvania law. We answer the question in the negative, although we do conclude that the debt in issue may be, in part, non-dischargeable on the grounds of embezzlement, under a different aspect of § 523(a)(4), or conversion pursuant to 11 U.S.C. § 523(a)(6).

### B. PROCEDURAL SETTING: A DECISION ON A F.R.CIV.P. 41(b) MOTION

The instant proceeding came before us in the rather unusual posture of a Motion ("the Motion") of HENRY Z. SPECTOR ("the Defendant") and MONICA S. SPECTOR ("the Wife") (collectively the Defendant and the Wife are referenced as "the Debtors") for judgment in their favor on all claims asserted in this proceeding challenging their discharge and dischargeability of their indebtedness to JAMES B. ROLLEY ("Rolley") and DAVID M. SALKOWSKI ("Salkowski") (collectively Rolley and Salkowski are referenced as "the Plaintiffs") under Bankruptcy Rule 7041 and Federal Rule of Civil Procedure ("F.R.Civ.P.") 41(b). F.R.Civ.P. 41(b) provides, in pertinent part, as follows:

> ... After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on

the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

The Motion was filed, at the close of a third day of testimony, and was granted from the bench as to the Wife. The decision as to the Wife was memorialized as part of an Order of August 23, 1991, setting the dates for the parties to make post-trial submissions. In a colloquy with the parties at the close of the trial, the court expressed some concern under precisely what Bankruptcy Code sections the Plaintiffs were proceeding. In a letter of October 2, 1991, drafted after the parties' submissions on the Motion were completed, the Plaintiffs agreed to withdraw any challenge to the Defendant's discharge, pursuant to 11 U.S.C. § 727(a), and urged this court to concentrate solely upon their challenges to dischargeability based upon 11 U.S.C. §§ 523(a)(4) and 523(a)(6). These Code sections provide as follows:

**§ 523. Exceptions to discharge**

(a) A discharge under section 727, 1143, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; ...

F.R.Civ.P. 41(b) is a useful device when, as here, the court has serious questions regarding the merit of a plaintiff's claim on any basis. *See In re Fitzgerald,* 73 B.R. 923, 929 (Bankr.E.D.Pa.1987); and *In re*

*Woerner,* 66 B.R. 964, 971, 977 (Bankr. E.D.Pa.1986), *aff'd,* C.A. No. 86–7324 (E.D.Pa. April 23, 1987). Its usefulness becomes considerably less apparent, when, as here, the court concludes that at least certain claims of the plaintiff might have merit, and hence the entire proceeding cannot be dismissed under the strict standards of F.R.Civ.P. 41(b), which require a conclusion that the plaintiff "has shown no right to relief." Then, it becomes a vehicle for piecemeal litigation and delay.[1]

Since we are able to narrow the issues, and restrict the Plaintiffs to a claim of no more than $20,000 against the Defendant under the embezzlement prong of § 523(a)(4) and possibly § 523(a)(6), we believe that F.R.Civ.P. 41(b) mandates that we "make findings as provided in Rule 52(a)." We also believe that this narrowing of the issues should spur a final settlement resolution of the controversy. If the parties are unable to do this on their own, we have scheduled a settlement conference before the Honorable Judith H. Wizmur of the District of New Jersey to attempt to accomplish this purpose.

The requisite Findings of Fact and Conclusions of Law contemplated by F.R.Civ.P. 52(a) follow.

**C. FINDINGS OF FACT**

1. The Debtors filed the underlying joint Chapter 7 bankruptcy petition on January 7, 1991. The main bankruptcy case remains open only due to the continued pendency of this proceeding. Except for a few uncontested motions by other creditors to obtain relief from the automatic stay to proceed to foreclose upon other properties of the Debtors not involved in this proceeding and of which they had little present concern, the case has been uneventful.

2. On January 18, 1991, the Clerk of the Bankruptcy Court directed a notice to the creditors which, *inter alia,* set a deadline of April 15, 1991, for filing objections to

---

1. We regret the delay of this court of almost 60 days in deciding the Motion. However, we utilized this proceeding as a vehicle of concentration for a clinical law student for whom we wished to provide as complete and hence fulfilling as possible an experience. We appreciate the parties' patience.

the discharge of the Debtors and/or filing any complaint to determine dischargeability under 11 U.S.C. § 523(c).

3. On April 15, 1991, the Plaintiffs commenced this adversary action by filing a pleading entitled "Complaint ... objecting to Dischargeability." It is the only such proceeding instituted in connection with this case. In their Complaint, the Plaintiffs asserted objections to dischargeability of the Debtors' indebtedness to them, pursuant to 11 U.S.C. §§ 523(a)(2), (a)(4), (a)(6), and possibly to the Debtors' discharge under 11 U.S.C. § 727(a). The Plaintiffs based their claims principally upon allegations that were contained in a yet-untried action, the Complaint in which is attached as an Exhibit to this Complaint, which had been filed in the Philadelphia Court of Common Pleas ("the CCP") against the Defendant, JOHN J. KONTRA, JR. ("Kontra"), MALCOLM ANTELL ("Antell"), ANDREW KLEEMAN ("Kleeman") and his corporate entity, MICHAEL MAENER, and FRANCIS DECEMBRINO ("Decembrino").

4. The trial of this proceeding commenced briefly on July 30, 1991, when two witnesses were before the court. The bulk of the trial was conducted in the late afternoon and evening of August 21, 1991, and it was completed on August 22, 1991.

5. At the close of Plaintiffs' case, the Debtors made the Motion orally. As is indicated *supra*, this court granted the motion as to the Wife, and thereby dismissed her from the case. However, as to the Defendant, the parties were instructed to submit proposed findings of facts and conclusions of law relevant to the Motion by September 3, 1991 (the Defendant), and September 16, 1991 (the Plaintiffs). These deadlines were ultimately extended, by agreements of the parties, to September 9, 1991, and September 30, 1991, respectively.

6. The substance of the Complaint arose from a partnership formed on June 1, 1988, by the Plaintiffs, the Defendant, Decembrino, and Kontra, known as 2nd Street Associates ("Associates"). Associates was to purchase and develop properties located at 770 South Second Street ("the 770 Property") and at 801 South Second Street ("the 801 Property"), which are located proximately to the fashionable South Street area of Philadelphia.

7. Pursuant to Paragraph 9 of the Partnership Agreement of June 1, 1988, which formed Associates ("the Agreement"), Spector and Kontra were appointed managing partners. As managing partners, Spector and Kontra were granted the authority to execute and deliver, *inter alia*, the following documents on behalf of Associates:

(a) A contract with Spector Construction Company, Inc. ("Spector Co."), an entity owned by the Defendant, to rehabilitate the 770 and 801 Properties;

(b) Sales agreements to purchase the Properties;

(c) Construction loans on behalf of Associates and of the partners as individuals;

(d) Mortgage notes on behalf of Associates and of the partners as individuals pertaining to the Properties.

8. Kontra's role as managing partner involved handling zoning matters and neighborhood relations as well as overseeing general administrative and tax matters. Additionally, Kontra and his wife individually signed the loan documents, since Antell, the proposed lender, required more security for the proposed construction loans than the other partners could provide.

9. The Defendant's role as a managing partner arose from his position as general contractor who would actually make the renovations of the 770 and 801 Properties. The Defendant was responsible for providing the general carpentry, dry wall and painting, as well as for overseeing the subcontractors, who provided, *inter alia*, the electrical, plumbing, and HVAC work. Among his duties as general contractor, the Defendant was responsible for purchasing building materials and supplies, as well as for paying the subcontractors for their work. The Defendant had participated in this capacity in several past successful ventures, at least one of which also involved Kontra.

10. The Plaintiffs and Decembrino each made an initial capital contribution of $16,000.00, resulting in total initial capital of $48,000.00. The parties proposed to borrow the total additional sum of $850,000.00 from Antell, and expend the total sum of $898,000.00 together with any additional capital that might be necessary to purchase and renovate the Properties. The partners agreed that the difference between $898,000.00 and the actual acquisition costs for the Properties (purchase price and closing costs) would be paid to the Defendant to perform the contemplated renovations.

11. The Agreement provided that any additional cash contributions required of the partners were to be furnished by Decembrino and the Plaintiffs.

12. On September 2, 1988, the 801 Property went to closing, and $224,499.74 in total monies were expended. By agreement of the partners, title to this Property was taken in the names of the Debtors individually. Of this sum, approximately $198,236.45 represented the purchase price, and the remaining $26,173.29 represented payment of closing costs, including loan fees.

13. On September 23, 1988, closing took place on the 770 Property and that property was conveyed to Associates. The total funds expended at this closing amounted to $231,011.15. Of this sum, $197,500.00 represented the purchase price and the remaining $33,511.15 represented payment of closing costs, including loan fees. Therefore, the total acquisition costs for the Properties was $455,510.89.

14. Testimony by Antell and Kontra indicated that $336,000.00 was the total mortgage proceeds paid out by Antell to Kontra and the Defendant for use on the 801 Property. Additionally, Antell and Kontra testified that $490,000.00 was the total mortgage proceeds paid out by Antell to Kontra and the Defendant for use on the 770 Property.

15. Aside from his initial $16,000.00 investment, Salkowski testified that he had contributed an additional $40,000.00, making his total contribution $56,000.00. Rolley stated he had invested an additional $30,000, which made his total contribution $46,000. Therefore, taking the three original $16,000.00 investments into consideration, the Plaintiffs and Decembrino contributed $118,000.00 to the partnership.

16. In light of the $118,000.00 invested by the Plaintiffs and Decembrino; the $336,000.00 in mortgage proceeds paid by Antell with respect to the 801 Property; and the $490,000.00 in mortgage proceeds paid out by Antell on the 770 Property, a total of $944,000.00 was utilized by the Defendant and Kontra for the acquisitions and renovations of the 801 and 770 Properties. If the total acquisition costs of $455,510.89 are deducted from the $944,000.00 available, that left $488,489.11 for the Defendant and Kontra to expend for renovations to the Properties and for the monthly construction loan payments from 1988 forward.

17. Kontra testified, supported by various records he had received and prepared, that he was able to account for a total of $88,694.97 paid to subcontractors by the Defendant and $115,631.78 in materials paid by the Defendant, which totals $204,326.75.

18. If $204,326.75 is deducted from the $488,489.11 paid to the Defendant and Kontra, there is a remaining $284,162.36 for which neither the Defendant nor Kontra have accounted.

19. Since the Defendant has not filed 1988 and 1989 income tax returns, either personally or for Spector Co., and did not issue W-2's or 1099's to himself, the Plaintiffs were unable to ascertain how much the Defendant paid for labor costs from the construction loan proceeds. Additionally, the Defendant testified that he primarily paid his "captured subcontractors" in cash without keeping records of the transactions, making calculation of his total labor costs virtually impossible.

20. Because of the Defendant's lack of record keeping, the Plaintiffs allege that they are unable to ascertain what happened to the $284,162.36, and it is that sum for which they are seeking a judgment against the Debtor.

21. Paragraph 8 of the Agreement provided that all funds of Associates were to be deposited in its name in an account designated by the partners. None of the partners authorized the Defendant to deposit Associates' funds into his own personal bank accounts. However, from the time construction began in September, 1988, through November, 1988, the construction draws from Antell to Associates were nevertheless endorsed by the Defendant and Kontra and deposited into the Defendant's own bank account.

22. In November, 1988, the partners held a meeting in a barroom. Both Plaintiffs and Decembrino testified that, at this meeting, the Defendant admitted that a partnership bank account had not been established, that Associates' funds had been deposited into his own bank accounts, and that he had used at least $20,000.00 of partnership funds for his own purposes. Salkowski reportedly became very angry and had to be restrained from striking the Defendant with a cue stick.

23. As a result of the November, 1988, barroom meeting, the manner in which Associates conducted its business was changed. From that point forward, all construction draws were deposited into a newly-created partnership bank account and Kontra was to monitor payment of all construction expenses. From November, 1988, to the time construction ceased in June, 1989, the construction draws were in fact deposited into the partnership bank account, and Kontra paid the majority of Associates' expenses directly from this account. Additionally, the Defendant was thereafter paid the sum of approximately $1,000.00 per week as a salary or profit for his ongoing services.

24. In April and May, 1989, Associates needed additional funds. The Plaintiffs therefore made the additional capital contributions referenced in paragraph 15 *supra*. However, Associates nevertheless exhausted its funds in May, 1989, and, since the interest payments on the loan were not current, Antell refused to advance further funds.

25. In May, 1989, the Defendant transferred his entire ownership interest in Associates to the Plaintiffs and Decembrino in equal shares and ceased to be a member of Associates. Salkowski testified that the Defendant indicated that this transfer of his ownership interest was a partial refund of the partnership's money which he had used for his own purposes.

26. In summer, 1989, Antell and the partners decided that they would not contribute any additional funds to Associates. The Defendant was without sufficient resources to continue construction, and he ceased construction activity.

27. In October, 1989, at a meeting at which Rolley, Decembrino, Kontra, and counsel for Decembrino and Rolley were present, the Defendant again admitted to having taken at least $20,000.00 from partnership funds for his own use on jobs unrelated to Associates. However, the Defendant also stated at that time that he had paid the money back to Associates, although he produced no records to support this contention.

28. Paul Calvert, the architect on the project, and James McKay, an engineer/architect retained by the Plaintiffs as an expert witness, testified that there were large amounts of work on both Properties to be finished before they could be placed in a leasable or saleable condition. Apparently, they are presently abandoned and deteriorating.

## D. CONCLUSIONS OF LAW.

1. The Plaintiffs' principal contention is that the Defendant should be denied a discharge under 11 U.S.C. § 523(a)(4). In assessing the standard of proof necessary to establish the nondischargeability of a debt under, apparently, any provision of § 523(a) of the Bankruptcy Code, the Supreme Court has recently held, in *Grogan v. Garner*, —— U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991), that the appropriate level of proof is the "preponderance of the evidence" standard. Therefore, the Plaintiffs must apparently meet this standard of proof in order to succeed as to any aspect of their claim against the Defendant

under § 523(a)(4), rather than meeting the "clear and convincing" standard which this court had previously held was required in establishing the presence of the requisite fiduciary capacity under this Code section. *See In re Bergman,* 103 B.R. 660, 667 (Bankr.E.D.Pa.1989); and *In re Borbidge,* 90 B.R. 728, 733 (Bankr.E.D.Pa.1988).

2. 3 COLLIER ON BANKRUPTCY, ¶ 523.14, at 523–102 (15th ed. 1991), explains that § 523(a)(4) creates an exception to discharge based upon "(i) fraud or defalcation while acting in a fiduciary capacity" or "(ii) embezzlement or larceny whether or not acting in a fiduciary capacity."

3. The presence of an express trust relationship is a prerequisite of a determination of nondischargeability based upon the first, or "fraud or defalcation," portion of 11 U.S.C. § 523(a)(4). *See Bergman, supra,* 103 B.R. at 667; *In re Ramonat,* 82 B.R. 714, 719 (Bankr.E.D.Pa.1988) (per TWARDOWSKI, CH. J.); and *In re Napoli,* 82 B.R. 378, 381 (Bankr.E.D.Pa. 1988) (per FOX, J.). In describing the nature of the fiduciary relationship that must be proven in a defalcation claim, we stated, in *Bergman,* 103 B.R. at 667, that

> it is well established that the requirement that the debtor be acting in a fiduciary capacity refers to express trusts and not to trusts *ex maleficio* which may be imposed due to the very wrongful act out of which the debt arose.

*Accord, e.g., In re James,* 94 B.R. 350, 352 (Bankr.E.D.Pa.1988) (per FOX, J.); *In re Lane,* 76 B.R. 1016, 1022 (Bankr.E.D.Pa. 1987); *In re Kapnison,* 65 B.R. 221, 223 (Bankr.D.N.M.1986); and *In re Gould,* 65 B.R. 87, 89 (Bankr.N.D.N.Y.1986).

4. The Plaintiffs argue that the Debtor was their fiduciary under an express trust relationship, for purposes of 11 U.S.C. § 523(a)(4), by virtue of the fact that the Defendant was one of the two managing partners of the partnership which the parties formed on June 1, 1988. While the bankruptcy courts are split as to whether a partner stands in the requisite "express trustee" fiduciary capacity as to limited partners, we must begin any analysis of this Code section by noting that, since 1842,

in *Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236, the Supreme Court of the United States has consistently interpreted the term "fiduciary" in the bankruptcy statutes thusly, in a narrow and limited fashion:

> In almost all commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these, is in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the [Bankruptcy Act] ... The act speaks of technical trusts, and not those which the law implies from contract.

*See Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333–34, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934); *In re Standard,* 123 B.R. 444, 452 (Bankr.N.D.Ga.1991); and *Napoli, supra,* 82 B.R. at 381.

Many courts that have addressed the issue of whether, for purposes of 11 U.S.C. § 523(a)(4), partners stand in a fiduciary relationship to each other, have turned to the Uniform Partnership Act for guidance. Pennsylvania, as well as a number of other states, has adopted the Uniform Partnership Act, 15 Pa.C.S. § 8334, which provides in pertinent part as follows:

§ 8334. Partnership accountable as fiduciary

(a) General Rule—Every Partner must account to the partnership for any benefit and hold as trustee for it any benefits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.

However, the *Standard* Court observed that

> [a] number of courts have considered the provision of the Uniform Partnership Act identical to O.C.G.A. § 14–8–21(a) and have concluded that this statute does not make a partner a fiduciary under § 523(a)(4). *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986);[7] *Moore v. Holman (In re Hurbace),* 42 B.R. 848, 850 (Bankr.E.D.Mo.1984); *Conohoe v. Hurbace (In re Hurbace),* 61 B.R. 563,

566 (Bankr.W.D.Tex.1986); *Medved v. Novak* (*In re Novak*), 97 B.R. 47, 59 (Bankr.D.Kan.1987); *Reiter v. Napoli* (*In re Napoli*), 82 B.R. 378 (Bankr. E.D.Pa.1988); *Arnett v. Weiner* (*In re Weiner*), 95 B.R. 204, 206 (Bankr.D.Kan. 1989). The reasoning of these cases is persuasive, and this Court agrees that O.C.G.A. § 14–8–21(a) does not establish an express or technical trust. The trust under this statute arises only when the partner derives profits without partnership consent. Thus, the trust created is a trust *ex maleficio* and does not create a fiduciary relationship within the meaning of § 523(a)(4). This is in accord with *Betz v. Gay* (*In re Gay*), 117 B.R. 753 (Bankr.M.D.Ga.1989), here the bankruptcy court in the Middle District of Georgia held that O.C.G.A. § 14–8–21 and O.C.G.A. § 14–8–14 do not create the fiduciary relationship between partners required by § 523(a)(4).

7. The law in the Ninth Circuit is not altogether clear. The Court in *Haller* in 1986 held that California partners are fiduciaries within the meaning of § 523(a)(4), but the Court's holding was based on a determination that California courts have made all partners trustees. The Court specifically stated that under the California statute identical to O.C.G.A. § 14–8–21(a), the trust arises only when the partner derives profits without partnership consent and that "it is the sort of trust *ex maleficio* not included within the purview of § 523(a)(4)." *Id.* at 796. However, the very next year, the Ninth Circuit held that the identical statute in Washington and Washington case law made a joint venturer in Washington a "fiduciary" within the meaning of § 523(a)(4). *Lewis v. Short* (*In re Short*), 818 F.2d 693, 695 (9th Cir.1987). The Court in *Short* did not acknowledge that in *Haller* it held that the same statute did not create such a trust.

*See also, e.g., In re Stone,* 91 B.R. 589, 594 (D.Utah 1988); and *In re Reeves,* 124 B.R. 5, 9–11 (Bankr.D.N.H.1990). *But see In re Guy,* 101 B.R. 961, 983–91 (Bankr.N.D.Ind. 1988); and *In re Kraus,* 37 B.R. 126, 130 (Bankr.E.D.Mich.1984).

The Plaintiffs argue that Pennsylvania common law elevates a partner to the requisite fiduciary relationship necessary to satisfy 11 U.S.C. § 523(a)(4). However, a review of the cases which the Plaintiffs cite, *Stainton v. Tarantino,* 637 F.Supp.

1051, 1066 (E.D.Pa.1986); *In re Estate of Hall,* 517 Pa. 115, 135, 535 A.2d 47, 56 (1987); and *Clement v. Clement,* 436 Pa. 466, 468–70, 260 A.2d 728, 729 (1970), does not indicate that the Pennsylvania courts have raised the fiduciary standard of a partner to that of a trustee. *Hall* makes only a passing reference to a partner's fiduciary duty to co-partners, as does *Stainton.* Neither hold that any such duty was breached in those cases. *Clement* reversed and remanded a decision in favor of the defendant on the grounds that the plaintiff was not obliged to prove actual fraud to succeed in an action against his brother-partner, and that the Defendant was not guilty of laches. It is clear that, under § 523(a)(4), the plaintiff need not prove actual fraud, but merely "fraud or defalcation" in a capacity as a trustee. It would be stretching the holding of *Clement* to conclude that it finds that a partner is a fiduciary comparable to the degree of a trustee of an express trust.

It appears to us that the law of Pennsylvania is very similar, if not identical, to that of New Jersey, as discussed by Judge Fox of this court in *Napoli, supra,* 82 B.R. at 382. The New Jersey cases spoke of the fiduciary duty which partners had to one another in a general sense, as does *Clement* and the other Pennsylvania-law cases. However, the holdings of the Pennsylvania and New Jersey cases are distinct from decisions in such states as California, *see Ragsdale, supra,* 780 F.2d at 796, and Indiana, *see Guy, supra,* 101 B.R. at 990, which expressly state that partners are trustees for each other. Therefore, this court finds that, under Pennsylvania law, partners do not stand in an express trust relationship capacity to one another sufficient to meet the standards for a "fiduciary" as set forth in 11 U.S.C. § 523(a)(4).

5. Although this court finds that, for purposes of 11 U.S.C. § 523(a)(4), the Defendant does not stand in the requisite express trust capacity to the Plaintiffs necessary to support the Plaintiffs' claim under the first prong of § 523(a)(4), the Plaintiffs' alternative claim, based on the second

prong of § 523(a)(4), is considerably stronger.[2] In reviewing the evidence presented in this case, which, as the Defendant observed, was convoluted and presented in scattergun fashion, it is evident that the Plaintiffs have presented sufficient evidence to withstand the Motion as to the Debtor's discharge under the embezzlement/larceny prong of 11 U.S.C. § 523(a)(4).

In order to satisfy the requirements of this alternate prong of § 523(a)(4), the Plaintiffs were not obliged to prove that the Defendant stood in a fiduciary capacity as to them. For purposes of § 523(a)(4), embezzlement has been defined as

the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come. It differs from larceny in the fact that the original taking of the property was lawful or with [the] consent of the owner, while in larceny the felonious intent must have existed at the time of the taking.

3 COLLIER, *supra,* § 523.14[3], at 523–113. *See also In re Crosswhite,* 91 B.R. 156, 159 (Bankr.M.D.Fla.1988); *Ramonat, supra,* 82 B.R. at 720; and *In re Salamone,* 78 B.R. 74, 77 (Bankr.E.D.Pa.1987).

▌ While the evidence presented at trial by the Plaintiffs was far from clear on many points, one fact remains very clear. It is evident that the Debtor admitted utilizing at least $20,000.00 worth of partnership funds for his own purposes. This fact was corroborated by testimony from Decembrino, a partner and a defendant in the Plaintiffs' similar, scattergun state court action, and the Plaintiffs themselves. The Defendant, though called to testify in the Plaintiffs' case, offered no denial of this testimony. It was thus established without rebuttal by the Plaintiffs at trial that Decembrino, Salkowski, the Plaintiffs, and the Defendant were at a barroom meeting with

the Debtor in November, 1988, where the Debtor admitted to using at least $20,-000.00 for his own purposes. In October, 1989, when attending a meeting with Decembrino, Salkowski, and their respective attorneys, the Defendant similarly admitted to using at least $20,000.00 in partnership funds for his own purposes, while attempting to assert, without evidentiary support, that he had repaid it. The fact that the Debtor endeavored to make repayment merely proves, if anything, that the Defendant knew that his appropriation of the $20,000 sum was wrongful.

In determining whether the Plaintiffs have asserted a valid claim under the embezzlement/larceny prong of 11 U.S.C. § 523(a)(4), the Plaintiffs now have the burden of proving by merely a preponderance of evidence that the Debtor misappropriated their (or Associates') funds. It appears that the Plaintiffs could quite conceivably be found to have sustained their burden of proof, at least as to $20,000, at trial.

By virtue of his position as a managing partner of Associates and the general contractor hired to renovate the Properties in question, the Defendant obviously had lawful access to the construction-loan funds provided by Antell. The partners had provided in paragraph 8 of the Agreement that all funds of the partnership were to be deposited into accounts designated by the partners. It was undisputed that there was no partnership bank account in existence from the time the partnership was formed in June, 1988, until November, 1988. The Defendant admitted depositing some construction loan checks into his own bank accounts during this period. Additionally, the Defendant admitted using some of the disputed funds for projects he was working on outside the scope of any work that he was doing for Associates.

Although the Plaintiffs contend that the funds unaccounted for total $284,162.36,

---

**2.** The Plaintiffs did not abandon their claim under the "second prong" of § 523(a)(4), although it is clearly their secondary claim. The emphasis on weaker claims is not confined to this issue. Had the Plaintiffs properly pleaded and preserved a claim under 11 U.S.C. § 727(a)(3), in light of the Debtor's virtually

non-existent record-keeping, the Plaintiffs very likely would have prevailed in a claim under 11 U.S.C. § 727(a)(3), causing the Debtor not to be discharged from any debts, including theirs. *See In re Goldstein,* 123 B.R. 514, 523–26 (Bankr. E.D.Pa.1991).

the Defendant's absence of record-keeping and the absence of other evidence rendered the Plaintiffs unable to prove where the bulk of these funds have gone. Although it is quite possible that the Defendant misappropriated much more than $20,000.00, it is also quite possible that some of these funds were paid to the Defendant's "captured subcontractors," whom he typically paid in cash with no documentary support, or that the Defendant was entitled to retain them as compensation for his own services. We therefore conclude that the Plaintiffs have only been able to show, by a preponderance of the evidence, that the Debtor very like embezzled $20,000.00 of Associates' money for his own purposes, in a manner unauthorized by his partners.

■ However, the Plaintiffs have failed to quantify their damages in any larger amount. A plaintiff is generally entitled to only those damages which the plaintiff is able to quantify. *See In re FRG, Inc.*, 121 B.R. 451, 458 (Bankr.E.D.Pa.1990); and *In re Valley Forge Plaza Associates*, 113 B.R. 892, 908 (Bankr.E.D.Pa.), *aff'd in part & rev'd in part on other grounds sub nom. Valley Forge Plaza Associates v. Rosen Agency, Inc.*, 120 B.R. 789 (E.D.Pa.1990).

6. The Plaintiffs also have not withdrawn their claims based on 11 U.S.C. § 523(a)(6). In order to prevail under this section of the Code, the Plaintiffs were obliged to prove, by a preponderance of the evidence, *see Grogan, supra*, 111 S.Ct. at 659; and *In re Braen*, 900 F.2d 621, 624–26 (3d Cir.1990), that the Debtor committed "willful and malicious injury."

There is a split of authority, nationally and locally, as to whether the plaintiff in a § 523(a)(6) claim must prove a specific intention on the part of the debtor to cause an injury to the plaintiff, or need prove only that the debtor's intentional actions, without just cause or excuse, resulted in damages to the plaintiff. *See* Comment, *The Exceptions to Discharge for Willful and Malicious Injury: The Proper Standard for Malice*, 7 BANKR.DEV.L.J. 245 (1990). *Compare United States v. Stelweck*, 108 B.R. 488, 496 (E.D.Pa.1989), *aff'g*, 86 B.R. 833, 851 (Bankr.E.D.Pa.1988);

*In re Gaebler*, 83 B.R. 264, 267 (Bankr. E.D.Pa.1988) (*"Gaebler I"*), *rev'd*, 88 B.R. 62 (E.D.Pa.1988) (*"Gaebler II"*); and *Lane, supra*, at 1023 (intent to cause injury to plaintiff required) *with Gaebler II, supra*, 88 B.R. at 64–65; and *In re Horldt*, 86 B.R. 823, 827–28 (Bankr.E.D.Pa.1988) (specific intent to cause injury to plaintiff not required).

■ It is clearly required that the plaintiff in a successful § 523(a)(6) action establish that the debtor has committed an unjustified, wrongful act, with at least scienter that the result of the act was necessarily to produce harm. *See In re Littleton*, 942 F.2d 551, 554 (9th Cir.1991); *In re Posta*, 866 F.2d 364, 367–78 (10th Cir.1989); and *In re Long*, 774 F.2d 875, 880–81 (8th Cir.1985). One court has expressly held that commission of the intentional tort of conversion always meets the requirements of § 523(a)(6). *Vulcan Coals, Inc. v. Howard*, 22 B.C.D. 301, 303, 946 F.2d 1226 (6th Cir.1991). Thus, the Plaintiffs may be able to prevail if they succeed in showing that a specific act was committed by the Defendant from which it could be inferred that the harm was intentionally caused, such as a conversion of funds. We conclude that it is possible that we could find that the Defendant converted at least $20,000 of Associates' property and that he knew that such a misappropriation would harm the Plaintiffs.

■ Generally, if an act is determined to "constitute embezzlement" for purposes of § 523(a)(4), it may also qualify as a willful and malicious act of conversion within the scope of § 523(a)(6). *See Bergman, supra*, 103 B.R. at 671; and *In re Beasley*, 62 B.R. 653, 655 (Bankr.W.D.Mo.1986). While § 523(a)(6) is apparently narrower in scope than the embezzlement prong of § 523(a)(4), and while we have some doubt that there is any evidence of proof that the Defendant intended to harm the Plaintiffs or acted with any degree of malice, there is little to be gained from dismissing the Plaintiffs' claim under § 523(a)(6), while refusing to dismiss the § 523(a)(4)/embezzlement claim. We therefore conclude that it would constitute error on our part, at this

juncture, to grant the Motion as to the Plaintiffs' § 523(a)(6) claim, at least as to the sum of the $20,000 which the Defendant appears to have admittedly taken without authority from Associates.

## E. CONCLUSION

The Motion will be denied as to those aspects of the Plaintiffs' claims which sought that $20,000 of the indebtedness of the Defendant to them may be nondischargeable under the embezzlement prong of § 523(a)(4), and under § 523(a)(6). Our accompanying Order also schedules a settlement conference of counsel before Judge Wizmur at 10:30 A.M. on December 13, 1991.

## ORDER

AND NOW, this 29th day of November, 1991, upon consideration of the Debtors' Motion pursuant to Bankruptcy Rule 7041 and Federal Rule of Civil Procedure 41(b) to involuntarily dismiss the Plaintiffs' case as to Defendant HENRY Z. SPECTOR ("the Defendant"), after a trial of same on July 30, August 21, and August 22, 1991, it is hereby ORDERED as follows:

1. The Motion is GRANTED in part.

2. Any claims of the Plaintiffs in excess of $20,000 under any legal theory other than the embezzlement prong of 11 U.S.C. § 523(a)(4) and under 11 U.S.C. § 523(a)(6) are DISMISSED. However, dismissal of the aforesaid claims is DENIED.

3. A settlement conference in this proceeding is scheduled before the Honorable Judith H. Wizmur at the following date, time, and place:

FRIDAY, DECEMBER 13, 1991, at 10:30 A.M. and shall be held in Room 20614, United States Court House (Judge Hutchinson's chambers), 601 Market Street, Philadelphia, PA 19106.