In re Robert E. NORED, Debtor.

Hollingsworth & Company, Plaintiff,

v.

Robert E. Nored, Individually and Jeffrey A. Levingston, Bankruptcy Trustee, Defendants.

Bankruptcy No. 01–16459.

Adversary No. 02–1029.

United States Bankruptcy Court, N.D. Mississippi.

May 8, 2003.

Leland H. Jones, III, Greenwood, MS, for Debtor.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is the complaint filed by Hollingsworth & Company (plaintiff) against Robert E. Nored (debtor or Nored), as well as, Jeffrey A. Levingston, in his capacity as bankruptcy trustee; a timely answer having been filed by Nored; and the court, having heard and considered same, hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(1).

### II.

In the pretrial order, entered in this proceeding on December 20, 2002, the parties stipulated to the following:

a. Plaintiff, Hollingsworth & Company, is a Mississippi partnership engaged in farming operations in Washington County, Mississippi. The partners of Hollingsworth & Company are Thomas C. Hollingsworth, James T. Hollingsworth, Jennifer L. Hollingsworth, Tom–Jim, Inc., a Mississippi corporation, Gran–Tom, Inc., a Mississippi corporation, and Hollingsworth & Foundation, Inc., a Mississippi corporation.

b. The defendant, Robert E. Nored, is an adult resident citizen of the First Judicial District of Carroll County, Mississippi, and his principal place of business is located in Leflore County, Mississippi, and he is the debtor in the above-styled and numbered bankruptcy case.

c. This court has jurisdiction of the parties hereto and the subject matter herein pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105 and 523(a)(2) and (a)(4) and the concept of pendant jurisdiction, together with related statutes and rules. This is a core proceeding.

d. At all times pertinent hereto, Hollingsworth & Company was engaged in farming operations in Washington County, Mississippi.

e. At all times pertinent hereto, defendant, Robert E. Nored, was individually engaged in the business of selling or brokering cotton in Greenwood, Leflore County, Mississippi,

under the trade name "W.H. Nored Cotton Company."

f. Defendant filed for protection under Chapter 7 of the Bankruptcy Code on October 31, 2001.

g. Defendant had communications with Sue Dunaway of Dunaway Cotton Company of Hollandale, Mississippi, regarding the "booking" of a number of bales of cotton belonging to Hollingsworth and Company. As a result of these communications two written confirmations of prices (one dated May 2, 2001 and one dated May 8, 2001) were prepared by Nored and delivered to Sue Dunaway.

### III.

The plaintiff's complaint against the debtor is based on § 523(a)(2) and § 523(a)(4) of the Bankruptcy Code which are set forth as follows:

11 U.S.C. § 523. Exceptions to Discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

### IV.

*Trial Testimony James Hollingsworth*

James Hollingsworth (Hollingsworth), the plaintiff's representative, testified that in May, 2001, he contacted Sue Dunaway (Dunaway), the owner of Dunaway Cotton Company, for the purpose of brokering the sale of 900 bales of cotton. Consistent with her customary business practices, Dunaway then contacted Nored, who was doing business under the trade name of W.H. Nored Cotton Company, to assist in arranging the sale. A few days later, this same process was repeated relative to the proposed sale of an additional 2700 bales of cotton. Plaintiff's Exhibit 1 and Exhibit 2, denominated as "fixation notices," were addressed to the plaintiff, executed by Nored, and delivered to Dunaway.

Hollingsworth indicated that he ultimately signed the two "fixation notices," which were dated respectively May 2, 2001, and May 8, 2001, and returned them to Dunaway. Neither he, nor any other representative of the plaintiff, had any direct contact with Nored. (This is consistent with Nored's testimony who said that he did not even meet Hollingsworth until after he had filed his bankruptcy case.)

Hollingsworth stated that after he returned the "fixation notices" to Dunaway, he did not know what happened to them. In addition, he did not have any information about the financial relationship between Dunaway and Nored. He would normally receive the plaintiff's proceeds from the cotton sales directly from Dunaway following a deduction of her commission. He did not expect to receive any payments from Nored.

Around this same time, Hollingsworth had a discussion with Dunaway concerning the reduction of the 2700 bales, set forth in the second "fixation notice," by 100 bales. Dunaway then had a conversation with Nored about the proposed reduction, but the substance of this conversation is substantially disputed. At this point, Hollingsworth stated that he thought that the entire 3600 bales had been sold through Nored.

Hollingsworth, who appeared to be an astute businessman, wanted to maximize the plaintiff's income through the aforementioned sales of cotton, as well as, through payments available from the Loan Deficiency Payment (LDP) government program. At trial, this latter source of income was referred to as the "POP" payment. Hollingsworth calculated the plaintiff's anticipated income on Plaintiff's Exhibit 6, a portion of which is excerpted immediately hereinbelow:

### NORED BOOKED PRICE

**1,771,433 TOTAL POUNDS OF COTTON**
**3,600 BALES**

900 Bales Booked @ 48¢ per pound
2,700 Bales Booked @ 47.9¢ per pound

Total 3,600 Bales at average price of 47.925¢/lb.

| | |
|---|---|
| Average Booked Price per pound: | 47.925¢ |
| Less Comm., Storage and fees: | −4.300 |
| Net Booked Price per pound: | 43.625¢ |

| | |
|---|---|
| Net Booked Price of 43.625¢/lb. x 1,771,433 pounds= | $ 772,787.65 |
| Plus Deficiency or "POP" pmt. (31.02¢ 1/lb × 1,771,433 lbs.) | +549,498.52 |
| **Net Sale Proceeds** | **$1,322,286.17** |

1. Represents deficiency payment on date Hollingsworth should have been able to complete sale of cotton.

At some time in October or early November, 2001, Hollingsworth determined that he wanted to activate the LDP subsidy because he felt that the payment rate was at its optimum. He then learned that the cotton had not been sold by Nored as he had earlier anticipated. Hollingsworth then sold the cotton through Paul J. Steinle, Jr., a Greenville, Mississippi, cotton broker, at substantially lower prices than reflected on the aforementioned "fixation notices." Based on the anticipated income, set forth hereinabove, Hollingsworth calculated the plaintiff's losses as follows: (From Plaintiff's Exhibit 6)

### ACTUAL SALE PRICE

**1,771,433 TOTAL POUNDS OF COTTON**
**3,600 BALES**

Total 3,600 Bales at avg. price of 24.5239¢/lb.

| | |
|---|---|
| Net Sale Price per pound: | 24.5239¢ |

| | |
|---|---|
| Net Sale Price of 24.5239¢/lb. x 1,771,433 pounds= | $434,424.46 |
| Plus Deficiency or "POP" pmt. (28.84¢ 2/lb. × 1,771,433 lbs.) | +510,881.28 |
| **Net Sale Proceeds** | **$945,305.74** |

2. Represents deficiency payment on date Hollingsworth actually sold cotton.

| | |
|---|---|
| **NET SALE PROCEEDS AT NORED BOOKED PRICE:** | $1,322,286.17 |
| **ACTUAL NET SALE PROCEEDS RECEIVED:** | −945,305.74 |
| **TOTAL LOSS:** | $ 376,980.43 |

Hollingsworth testified that before he could request the LDP or "POP" payment, which was exclusively within his discretion, the cotton warehouse receipts, evidencing the sale and storage of the cotton, must be in hand. None of the LDP funds would flow through Nored or Dunaway, but they would be paid directly by the governmental agency to the plaintiff.

### Sue Dunaway

Sue Dunaway testified that she always used a co-broker in arranging cotton sales. She received $2.00 for each bale sold as compensation for her services. Dunaway advised that after her initial conversation with Hollingsworth, she called Nored to assist in selling the plaintiff's cotton as discussed hereinabove.

Following a subsequent conversation with Hollingsworth, Dunaway said that she contacted Nored about reducing the 2700 bale proposed sale by 100 bales. Nored allegedly told her that he had already sold the cotton, and that the reduction, consequently, could not be accommodated. This is in sharp contrast to Nored's version of this discussion which will be set forth subsequently.

Dunaway also indicated that, following the issuance of the "fixation notices," that she had several conversations with Nored over the next several months, requesting on more than one occasion that he send

her a table, utilized by the proposed purchaser, which would detail the specifications for the cotton, such as leaf grade, color, micronaire, staple, etc. She indicated that on none of these occasions did Nored tell her that the cotton had not been sold. In direct contradiction, Nored testified that these conversations never occurred.

On her initial cross examination, Dunaway stated that on infrequent occasions she utilized a more detailed and comprehensive document entitled, "Contract for the Sale and Purchase of Cotton," marked for identification as Debtor's Exhibit 1, in sales transactions that she co-brokered with Nored. On her cross-examination as a rebuttal witness, she acknowledged that she had actually used this contract form on one occasion involving a previous sale of the plaintiff's cotton. She also acknowledged utilizing this form in sales brokered for Thomas Brewton.

Significantly, Dunaway indicated that the "fixed price" appearing on the "fixation notices" could be subject to reductions depending on the grade, quality, and color of the cotton.

Contrary to the testimony of Nored, Dunaway stated that once she received the executed "fixation notices" from Hollingsworth that she mailed copies back to Nored. Nored testified that not only did Dunaway not mail him copies of the "fixation notices," but that he did not even see executed copies of the notices until the day of the trial. The court notes that only *unexecuted* copies of the notices insofar as the plaintiff's signature is concerned were appended to the plaintiff's complaint. The plaintiff's signature is also significantly absent on the documents introduced as Plaintiff's Exhibits 1 and 2.

### Paul J. Steinle, Jr.

Paul J. Steinle, Jr., the owner of P.J.S., Inc., a cotton brokerage firm in Greenville, Mississippi, advised that he had sold Hollingsworth's 2001 cotton crop. He verified the actual sales numbers which appeared on Plaintiff's Exhibit 6.

Steinle also indicated that, after reviewing the "fixation notices," that he would have assumed that Nored had sold the cotton to either a cotton merchant or a cotton mill.

### Robert E. Nored

Nored testified that on an average he brokered approximately 20,000 to 30,000 bales of cotton each crop year through Dunaway. He stated that he initially told Dunaway, when presented with the proposal to sell the plaintiff's cotton, that he would fix the price according to the "fixation notices." He said that Dunaway had driven to his office in Greenwood to retrieve these notices. However, she subsequently called him telephonically shortly after he signed the second notice, and indicated that, because the plaintiff had planted a number of acres of "insurance cotton," that the transaction would have to be recalculated. Dunaway allegedly told Nored that she would re-contact him later, but she never did so. Nored testified that since he was not re-contacted by Dunaway and, since no one ever sent him the executed copies of the "fixation notices," that he thought that Dunaway had cancelled the sales.

While Nored acknowledged that he executed the two "fixation notices," he stated unequivocally that he would not undertake to broker these sales months in advance unless a detailed form entitled, "Contract for the Sale and Purchase of Cotton," marked for identification as Debtor's Exhibit 1, was executed. He indicated that this form had been utilized on other occasions in his dealings with Dunaway, and specifically recalled that it had been utilized on one previous occasion when he

brokered a sale of the plaintiff's cotton. As noted hereinabove, this was ultimately admitted by Dunaway during her cross examination as a rebuttal witness.

As the trial testimony "unfolded," the court became aware of the acute contrast in the testimony of Nored and Dunaway, both of whom have an interest and motivation in testifying as they did. As a part of the decision process, the court must determine which version of the facts is the more reasonable and credible.

Nored stated that if the cotton had already been picked and graded, where he could use a "recap form" containing the grading information, that he would not need to rely on the more detailed contract form. Under these circumstances, he could rely exclusively on the "fixation notices." The recap information obviously would not be available until much later in the crop year. Nored said that he could not broker advanced sales using only the "fixation notices" because these notices contained no provisions to address issues concerning the quality of the cotton. Nored's testimony is much more plausible than that of Dunaway who indicated that the price on the "fixation notices" would simply be adjusted downward in unspecified increments if the quality of the cotton was inferior at the time it was actually warehoused and graded.

Nored's version as to why he made no effort to sell the plaintiff's cotton is also more plausible. He thought that Dunaway had effectively cancelled the transactions. No person, having only a modicum of intelligence, and certainly not someone with over thirty years in the cotton brokerage business, would forego selling the plaintiff's cotton when the price was cascading steadily downward from 47.925¢ per pound to 24.5239¢ per pound during the six month period from May to November, 2001. It is more reasonable to presume, as Nored testified, that he would have hedged his position at some point during this spiral to prevent a catastrophic loss. The court cannot accept the premise advanced by the plaintiff that Nored was simply gambling that the price of cotton was going to dramatically rise, and that he would reap the benefits of such a turnaround. A careful analysis of all the facts leads this court to the opposite conclusion, that is, that Nored thought legitimately that the sales had been cancelled by Dunaway. A summary of the points that lead the court in this direction are as follows:

1. Nored never had any direct contact with Hollingsworth or any other representative of the plaintiff until after he had filed bankruptcy.

2. The court does not believe that the fully executed "fixation notices" were ever returned to Nored who testified that he did not see the documents bearing the plaintiff's signature until the day of trial. This appears to be consistent with what was available to the plaintiff since the copies of the "fixation notices" that were appended to the complaint only bore the signature of Nored, not that of the plaintiff. In addition, the copies of the "fixation notices" that were introduced into evidence by the plaintiff were not signed by the plaintiff.

3. It is undisputed that Dunaway and Nored had a conversation about reducing the number of bales on the 2700 bale transaction after the second notice had been signed by Nored. Dunaway was supposed to recontact Nored concerning the recalculation of the bales to be sold. The court does not believe that she did so.

4. The "fixation notices" were executed in early May, 2001, months in advance of the actual contemplated

sales. No provisions are set forth on the "fixation notices" concerning the quality of the cotton, i.e., leaf grade, color, micronaire, staple, etc. It is understood that if certain standards are not met when the cotton is graded that the price will be reduced accordingly. Dunaway's testimony that the "fixation notices" would be adjusted downward in unspecified increments does not appear to be a reasonable solution to this likely occurrence.

5. For advance sales, Nored's testimony to the effect that he would rely on the more detailed transaction form entitled "Contract for the Sale and Purchase of Cotton," which clearly contains provisions relative to the cotton quality issues, is simply more credible. After Dunaway's second round of cross-examination, she acknowledged that this form had been utilized before in the sale of the plaintiff's cotton in a transaction that she co-brokered with Nored.

6. In a transaction of this magnitude, if the plaintiff and Dunaway were relying exclusively on Nored to broker the sales months in advance, the court is of the opinion that it was not reasonable for them to rely solely on the "fixation notices." These notices merely fix the price that, for advance sales, would be subsequently incorporated into a much more detailed contractual document.

## V.

■ Before the plaintiff can even begin to proceed to § 523(a)(2)(A) and § 523(a)(4) of the Bankruptcy Code to establish the nondischargeability of a debt, the plaintiff must first convince the court that a debt is actually owed. The burden of proof on this issue rests squarely on the plaintiff by a preponderance of the evidence. *See, Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■ In the matter currently before the court, the proof is not convincing that Nored was contractually bound to sell the plaintiff's cotton at the prices set forth in the two "fixation notices." Rather, the court believes that Nored legitimately thought that the sales transactions had been cancelled by Dunaway. Otherwise, he would have had copies of the "fixation notices" executed by the plaintiff "in hand," and he would have proceeded to obtain the execution of the Contract for the Sale and Purchase of Cotton form. While the plaintiff certainly appears to be an innocent party in this unfortunate scenario, it should have done more, through its representatives, to insure and verify that the anticipated sales were contractually binding. The court is, therefore, of the opinion that the plaintiff's complaint is not well taken and it must be dismissed.

## VI.

Although it is actually not necessary to comment on § 523(a)(2) and § 523(a)(4) of the Bankruptcy Code in view of the aforementioned conclusion, the court believes that the following observations should be included to appropriately address all aspects of the plaintiff's complaint:

■ Even if the court were to conclude that the transaction to sell the plaintiff's cotton had not been cancelled, there is still no actionable fraud as contemplated by § 523(a)(2)(A) of the Bankruptcy Code. If the two "fixation notices" were actually binding contracts, Nored would have effectively promised the plaintiff that he would either purchase or sell the plaintiff's cotton at a specific price when it was harvested. In May, 2001, the cotton had just been planted. It would not be available for purchase or for sale for several months. Consequently, Nored could have only

made a promise to perform an act in the future. Unless the plaintiff can establish that Nored had a present undisclosed intent not to perform when he executed the "fixation notices," a cause of action for fraud cannot be maintained. The Mississippi Supreme Court addressed this issue in *Credit Industrial Co. v. Adams County Lumber and Supply Co.*, 215 Miss. 282, 60 So.2d 790 (1952), as follows:

> [F]raudulent representations upon which a party may predicate any demand for relief must relate to past or presently existing facts, as facts, and cannot consist of promises, except in some cases when a contractual promise is made with the present undisclosed intention of not performing it.
>
> . . . .
>
> It is the general rule that fraud cannot be predicated upon statements which are promissory in their nature when made and which relate to future actions or conduct, upon the mere failure to perform a promise—non-performance of a contractual obligation—or upon failure to fulfill an agreement to do something at a future time... "mere promise to perform an act in the future is not, in a legal sense, a representation, and that a mere failure to perform it does not change its character". 23 Am.Jur. p. 801.

215 Miss. 282, 60 So.2d 790 at 794. (quoting *McArthur v. Fillingame*, 184 Miss. 869, 186 So. 828, 829 and 23 Am.Jur., pp. 799, 800, Fraud and Deceit, par. 38.) *See also*, 37 Am.Jur. 2d, Fraud and Deceit, § 60 at page 92, 93, § 61 at page 94, 59; *Perrault v. White Sewing Machine Co.*, 157 Miss. 167, 127 So. 271 (1930), *McArthur v. Fillingame*, 184 Miss. 869, 186 So. 828 (1939); *Salitan v. Horn*, 212 Miss. 794, 55 So.2d 444 (1951); *House v. Holloway*, 258 So.2d 251 (Miss.1972); and *In re Posey*, 57 B.R. 858 (Bkrtcy.N.D.Miss.1985).

The plaintiff has offered no evidence that Nored had an undisclosed intention not to purchase or sell the plaintiff's cotton when the two notices fixing the prices were signed. As such, that part of the plaintiff's cause of action for fraud against Nored is not well taken.

Section 523(a)(4) of the Bankruptcy Code relates to "fraud or defalcation while acting in a fiduciary capacity." As noted hereinabove, Nored never met James Hollingsworth or any other representative of the plaintiff until after he had filed his bankruptcy case. Hollingsworth confirmed this factor and acknowledged that the plaintiff did not anticipate receiving any payments directly from Nored.

 *Collier on Bankruptcy*, § 523.10[1][c], addresses the characteristics necessary to constitute a "fiduciary capacity" as follows:

> The mere fact that state law places two parties in relationship that may have some of the characteristics of a fiduciary relationship does not necessarily mean that the relationship is a fiduciary relationship under 11 U.S.C. § 523(a)(4), which requires the existence of express or technical trust. As one court has observed:
>
> > [C]ase authority recognizes that the traditional definition of "fiduciary" is not applicable in defining "fiduciary capacity" under section 523(a)(4). The general meaning of a fiduciary—a relationship involving confidence, trust and good faith—is far too broad for the purposes of section 523(a)(4) .... The Supreme Court favors a narrow construction of the term "fiduciary capacity" and defines the term as meaning arising from an express or technical trust.[10]
>
> Thus, unless there exists some additional fact, section 523(a)(4), as it relates to a debtor acting in a fiduciary capacity,

does not generally apply to frauds of agents,[11] bailees,[12] brokers,[13] factors,[14] and partners,[15] and other persons similarly situated.[16]

. . . . .

Certain relationships are generally recognized as involving fiduciary obligations within the meaning of section 523(a)(4).[20] Bank officers,[21] executors and administrators,[22] guardians,[23] receivers,[24] the president of a private corporation entrusted with funds for a particular purpose,[25] the sole manager of a joint venture's affairs,[26] and, of course, other technical trustees [27] have been held to be acting in a fiduciary capacity within the meaning of this provision.

---

10. *In re Twitchell*, 91 B.R. 961, 964–65 (D.Utah 1988), *citing Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *accord Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367 (10th Cir.1996); *In re Librandi*, 183 B.R. 379 (M.D.Pa.1995); *In re Kaplan*, 162 B.R. 684, 704 (Bankr.E.D.Pa.1993); *aff'd*, 189 B.R. 882 (E.D.Pa.1995).

11. *In re Grabau*, 151 B.R. 235 (Bankr. N.D.Cal.1991), *aff'd in part, rev'd on other grounds*, 151 B.R. 227 (N.D.Cal.1993); *Air Traffic Conference of America v. Paley (In re Paley)*, 8 B.R. 466, 3 C.B.C.2d 648 (Bankr. E.D.N.Y.1981); *Borg–Warner Acceptance Corp. v. Miles (In re Miles)*, 2 C.B.C.2d 892, 5 B.R. 458 (Bankr.E.D.Va.1980); *Angelle v. Reed (In the Matter of Angelle)*, 610 F.2d 1335 (5th Cir.1980); *Devaney v. Dloogoff (In the Matter of Dloogoff)*, 600 F.2d 166 (8th Cir. 1979).

12. *See generally George Busby Ford, Inc. v. Ross*, 62 Tenn.App. 80, 459 S.W.2d 46 (1970).

13. *See In Re Maynard*, 153 B.R. 933 (Bankr.M.D.Fla.1993); *In re Danahy*, 45 F.Supp. 758 (W.D.N.Y.1942).

14. *In re Adler*, 152 F. 422 (2d Cir.1907).

15. *In re Spector*, 26 C.B.C.2d 161, 133 B.R. 733, (Bankr.E.D.Pa.1991); *In re Tocci*, 9 C.B.C.2d 636, 34 B.R. 66 (Bankr.S.D.Fla. 1983), *modified*, 39 B.R. 1000 (Bankr. S.D.Fla.1983) *But see, LSP Investment Partnership v. Bennett (Matter of Bennett)*, 989 F.2d 779, 28 C.B.C.2d 1446 (5th Cir.1993), *cert. denied*, 510 U.S. 1011, 114 S.Ct. 601, 126 L.Ed.2d 566 (1993); *Ragsdale v. Haller*, 780 F.2d 794 (9th Cir.1986). *See also John-son v. Woldman*, 29 C.B.C.2d 1542, 158 B.R. 992 (N.D.Ill.1993).

16. *Matter of Woldman*, 92 F.3d 546 (7th Cir.1996) (no fiduciary relationship created by agreement of attorney to pay referral fee to another attorney); *Barclays Am./Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 13 C.B.C.2d 1036 (8th Cir.1985). *See also Driggs v. Black (In re Black)*, 787 F.2d 503, 14 C.B.C.2d 1215 (10th Cir.1986) (defalcation claim failed because the debtor as a corporate officer did not stand in a fiduciary capacity to the minority shareholder individually when the acts complained of occurred); *In re McKinney*, 151 B.R. 944 (Bankr.N.D.Okla. 1993); *Matter of Touchstone*, 149 B.R. 721 (Bankr.S.D.Fla.), *modified*, 153 B.R. 955 (Bankr.S.D.Fla.1993).

. . . . .

20. [Reserved]

21. *Harper v. Rankin*, 141 F. 626, *cert. denied*, 200 U.S. 621, 26 S.Ct. 758, 50 L.Ed. 624 (1906).

22. *In re Reed*, 155 B.R. 169 (Bankr. S.D.Ohio 1993).

23. *In re Dauterman*, 156 B.R. 976 (Bankr.N.D.Ohio 1993); *Alabama Nat'l Bank of Montgomery v. Beach (In re Beach)*, 5 C.B.C.2d 31, 13 B.R. 759 (Bankr.M.D.Ala. 1981); *Aetna Ins. Co. v. Byrd (In re Byrd)*, 15 B.R. 154 (Bankr.E.D.Va.1981).

24. *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir.1937), *aff'g In re Herbst*, 22 F.Supp. 353 (S.D.N.Y.1937). *See also In re Moffitt*, 146 B.R. 364 (Bankr. S.D.Tex.1992).

25. *See Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417 (5th Cir.1990).

26. *Lewis v. Short (In re Short)*, 818 F.2d 693, 17 C.B.C.2d 143 (9th Cir.1987); *In re Shane*, 26 C.B.C.2d 1617, 140 B.R. 964 (Bankr.N.D.Ohio 1992).

27. *Matter of Touchstone*, 149 B.R. 721 (Bankr.S.D.Fla.), *modified*, 153 B.R. 955 (Bankr.S.D.Fla.1993).

Consequently, considering the above authorities, as well as, the pertinent facts developed by the proof in this proceeding, this court cannot conclude that Nored was acting in a fiduciary capacity insofar as the plaintiff was concerned. That part of the plaintiff's cause of action, alleging a violation of § 523(a)(4) of the Bankruptcy Code, is also not well taken.

843

An order will be entered consistent with this opinion.